[No. 25443. *En Banc.* July 20, 1935.]

ANDREW C. EVANS *et al., Respondents,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 47 P. (2d) 984.

*A. C. Van Soelen* and *John E. Sanders,* for appellant.

*Kennedy & Schramm* and *L. Presley Gill,* for respondents.

TOLMAN, J.—Six several suits instituted to recover damages for the alleged wrongful diversion of underground waters were, by stipulation, consolidated and tried to the court, sitting without a jury, resulting in findings favorable to the plaintiffs and a judgment against the city aggregating eleven thousand dollars, which was segregated so that the plaintiff or plaintiffs in each of the original actions were each awarded a definite and specific amount. The city has appealed from that judgment.

The assignments of error question almost every fact now material, as well as the law which was applied by the trial court. This has required a patient and exhaustive study of all of the evidence offered. Before we discuss the questions of fact which are in dispute, the general setting must be outlined.

The appellant city is the owner of certain acreage which it purchased for the purpose of developing a gravel pit and for the production therefrom of a particularly desirable quality of gravel for use on its roads and streets. The respondents own small tracts of land adjacent to the city's holdings, but at a lower

452

level, each improved with residence, lawns, gardens and cultivated portions; and, in addition, one of these tracts has been developed into a commercial frog farm. Each and all of the owners of these tracts have constructed and developed water systems, upon which they depend for domestic purposes, for irrigation, and for all other purposes useful to them. These water systems have been fed and supplied with amply sufficient water from springs and small streams which appear on the surface at points some distance from and below the level of the city's gravel pit.

About September 2, 1931, the city, in order to drain its gravel pit and thus be able more advantageously to take out gravel for use, excavated a ditch to a considerable depth leading northerly and directly away from the properties of the respondents. It seems to be now admitted that, immediately after the ditch was opened, all of the water, or practically all, was diverted from the springs and streams upon which respondents relied for their water supply, and that, as the direct and proximate result of the opening of the ditch by the city, the respondents suffered a total loss of their theretofore sufficient water supply.

The appellant city seems to admit the facts so far stated, and upon that general situation it contends (1) that the respondents have failed to establish the existence of a known and well-defined underground stream, either in law or in fact; and (2) if the waters which have been diverted by the city were percolating waters only, then in the exercise of its right to reasonably use its own property, the city might lawfully divert such percolating waters without liability, and any damage suffered by the respondents was what is known to the common law as *dammum absque injuria*.

In the early case of *Meyer v. Tacoma Light &*

*Water Co.,* 8 Wash. 144, 35 Pac. 601, this court recognized the doctrine that

". . . a flow underground will be protected the same as one upon the surface, if it constitutes a stream with defined course and boundaries."

What we conceive to be the general rule is well stated in 67 C. J. 834:

"All underground waters are presumed to be percolating, and, to take them out of the rule with regard to such waters, the existence and course of a permanent channel must be clearly shown.

. . . . . . . . . . .

"Where a subterranean stream flows in a distinct, permanent, well-known and defined channel, it is governed by the same rules as apply to a natural watercourse on the surface, and the owners of land beneath which it flows have the same rights with respect to it as riparian proprietors have with respect to a stream on the surface, conditioned on the water coming to his land in a natural flow regardless of whether or not it is under pressure. . . . Once a subterranean stream is known to exist, the presumption is that it has a fixed and definite course and channel through which it flows and which varies only with the erosion which the water produces, . . ."

The subject is likewise well covered in 27 R. C. L. 1167 *et seq.,* and what is there said supports the rules just quoted.

2 Kinney on Irrigation and Water Rights (2d ed.), § 1156, reads:

"Those subterranean water courses whose channels are known and defined, as stated in our classification, are again subdivided into known independent subterranean water courses and known dependent subterranean water courses. Known independent subterranean water courses are those which, independent of the influence of any surface streams, flow underneath the surface of the land in well-defined and

known channels, the courses of which can be distinctly traced.''

. The same author in § 1165 says:

''However, it is much more difficult to prove the existence of a subterranean water course than it is to prove the existence of a surface water course. This is largely due, as was held in an early Vermont case, to the physical laws governing underground water and its subterranean progress being irregular and unknowable to any certainty, and such water being changeable and uncontrollable in character and subject to secret and incomprehensible influences.''

3 Farnham on Waters and Water Rights, § 947, gives this rule:

''The mere diversion of the direction of percolation of subterranean water by clay which fills a seam in a stratum of sandstone through which such water passes does not change its character as percolating water, and constitute it a defined flowing stream which cannot be interfered with by a licensee of the owner of the soil through which it flows, to the detriment of the owner of the water of a creek partly supplied thereby, although the lower part of the stratum may be more highly charged with water than the upper part. But it is essential to the nature of percolating waters that they do not form part of the body or flow, surface or subterranean, of any stream. Subterranean water is presumed to be percolating, and therefore one who claims rights in a flowing stream has the burden of showing its existence.''

See, also, *Barclay v. Abraham*, 121 Ia. 619, 96 N. W. 1080, 100 Am. St. 365, 64 L. R. A. 255; and *Clinchfield Coal Corp. v. Compton*, 148 Va. 437, 139 S. E. 308, 55 A. L. R. 1376.

The trial court found:

''That at all times prior to September 2, 1931, a well-defined underground stream flowed in a known channel southwesterly through said gravel pit property, coming to the surface in springs and streams

upon the property of the several plaintiffs, and also subirrigating said properties; that the waters from said underground stream furnished ample water to all of said properties for domestic use and irrigation, and were so used by the several plaintiffs above named, and were the sole source of water supply for most of said properties.''

With the rules of law just mentioned kept constantly in mind for our guidance, we have carefully read and considered all of the evidence touching the existence of what the law recognizes as a well-defined underground stream.

In addition to surface indications readily observable and the evidence of non-experts, the record contains the exhaustive testimony of expert witnesses, two on each side of the controversy, and to this evidence in the main we must look for that clear and convincing proof which is necessary to overcome the presumption that all underground waters are percolating.

It would be worse than useless to attempt to discuss and analyze this testimony in detail or to quote from it to any considerable extent. We naturally assume that each expert witness gave an honest opinion, and therefore the facts and reasons upon which each opinion was based are here of vital importance.

The gravel pit and the area surrounding it is said to be a glacial deposit. The gravel deposit is intermixed with strata, sills and hard pans of somewhat impervious character, called by experts ''tight material,'' composed of clay and other deposits which undoubtedly, before the disturbance took place, controlled and directed very largely the course of the escape of the water from the gravel reservoir. It does not appear that anyone contended that the so-called underground stream actually existed above the gravel deposit, and we think we are justified in assum-

ing that the gravel deposit was a natural reservoir in which the rainfall and the percolating waters from higher levels gathered. Therefore, if there was an underground stream leading from the gravel pit, it was created and fed from that source alone. Apparently predicated upon this fact, the respondents' principal expert testified:

"You notice in looking into this bank that some stratas are coarse gravels and some of them finer material, silt and sand, and some very fine areas of clay in the upper banks, so that the result would be that in that area the water coming down southeast and flowing on that area and draining off the hills southeast would enter very largely into these porous gravels and, instead of flowing on down in this northwesterly direction, would be diverted by this stratification, which would tend to check it and divert it to the southwest, so that the natural outlet for this delta area in there would be down through the southwest corner adjacent to the tight material against which it was flanked.

"The upper portions of that are not absolutely water tight. It could work sidewise but the general trend would be to the southwest."

The witness did not assert, nor does anyone testify, that this stratification is regular or continuous to any considerable extent. Indeed, the contrary was admitted. This character of evidence falls far short of being substantial evidence of an underground stream flowing in any distinct, permanent, well-known and defined channel, or that the springs and surface streams which were the source of respondents' water supply were fed by anything other than percolating waters. The stratification being admittedly broken and irregular, so far as it can be observed, and being wholly unknown except as exposed in the gravel pit excavation, the existence of an underground stream, as defined by law, running from the gravel pit is

wholly speculative, and expert opinion based thereon to a contrary effect is no more than a guess or a wish.

A further discussion of the evidence upon this point would not be helpful. Notwithstanding the finding of the trial court, we are constrained to hold that respondents produced no substantial evidence of the existence of what the law knows as an underground stream.

The waters here involved being percolating waters, our next inquiry must be as to the law governing the diversion of such waters. The English common law rule is that he who owns the land owns everything below and above it, and that the percolating waters under his land are his property, which he may use as he sees fit without being in any way answerable to others.

If this rule ever obtained in this country it has been greatly modified by the modern decisions. The American courts have adopted the rule of reasonable use, which limits the right of the landowner to such amount of the percolating waters under his land as may be necessary for some useful purpose or such as it may be necessary for him to divert in order to make reasonable use of his land.

This court, in *Patrick v. Smith*, 75 Wash. 407, 134 Pac. 1076, 48 L. R. A. (N. S.) 740, adopted the modern American rule of correlative rights in percolating waters. It is there said:

"But aside from this, the modern trend of authority and what we consider the juster and sounder view is that there are correlative rights in percolating waters and that one landowner may not collect subterranean water for the purpose of merchandise or collect and waste it to the prejudice of another landowner.

" 'The later and better considered cases are beginning to recognize correlative rights in percolating

waters and confine landowners to a reasonable use of it. . . . In all cases where there is a community ownership of, or common right to, the enjoyment of a natural product, the rule is that one of the joint owners can make only a reasonable use of his interest so as not unnecessarily or unreasonably to injure or destroy the equal rights of the co-owners. This rule should apply to the subject of water from a saturated stratum extending under the property of several owners. And this is the rule which has been applied by the great weight of authority.' 3 Farnham, Water and Water Rights, p. 2718. (Citing cases.)

"The principles of natural justice and equity demand the recognition of correlative rights in percolating subterranean waters, so that each landowner may use such water only in a reasonable manner and to a reasonable extent upon his own land and without undue interference with the rights of other landowners to a like use and enjoyment of waters percolating beneath their lands. *Meeker v. City of East Orange, supra* [77 N. J. L. 623, 74 Atl. 379]."

This rule we find to be in harmony with the great weight of authority in this country.

*Gagnon v. French Lick Springs Hotel Co.*, 163 Ind. 687, 72 N. E. 849, 68 L. R. A. 175; *Stillwater Water Co. v. Farmer,* 89 Minn. 58, 93 N. W. 907, 99 Am. St. 541, 60 L. R. A. 875; *Barclay v. Abraham,* 121 Iowa 619, 96 N. W. 1080, 64 L. R. A. 255, 100 Am. St. 365; *Erickson v. Crookston Waterworks, Power & Light Co.,* 100 Minn. 481, 111 N. W. 391, 8 L. R. A. (N. S.) 1250; *Bernard v. St. Louis,* 220 Mich. 159, 189 N. W. 891; *Olson v. Wahoo,* 124 Neb. 802, 248 N. W. 304; *Dunbar v. Sweeney,* 230 N. Y. 609, 130 N. E. 913; *Cason v. Florida Power Co.,* 74 Fla. 1, 76 So. 535; *Bassett v. Salisbury Mfg. Co.,* 43 N. H. 569, 82 Am. Dec. 179; *Meeker v. East Orange,* 77 N. J. L. 623, 74 Atl. 379, 25 L. R. A. (N. S.) 465, 134 Am. St. 798.

California, influenced perhaps by local conditions and the supreme need of water for irrigation pur-

poses, seems to have placed the right to use such waters above every other right, even to the extent of denying a landowner the reasonable use of his own property.

*Hudson v. Dailey,* 156 Cal. 617, 105 Pac. 748; *Miller v. Bay Cities Water Co.,* 157 Cal. 256, 107 Pac. 115; 27 L. R. A. (N. S.) 772; *Burr v. Maclay Rancho Water Co.,* 160 Cal. 268, 116 Pac. 715; *San Bernardino v. Riverside,* 186 Cal. 7, 198 Pac. 784.

Respondents contend that Utah has followed the California rule, but in the Utah cases cited we find a clear commercial use which seems to bring those cases into harmony with the general rule. *Horne v. Utah Oil Refining Co.,* 59 Utah 279, 202 Pac. 815, 31 A. L. R. 883; *Glover v. Utah Oil Refining Co.,* 62 Utah 174, 218 Pac. 955, 31 A. L. R. 900.

We cannot follow the extreme California rule. The reasonable use and the correlative rights doctrine seem to us not only to have been already adopted in this state by the *Patrick* case, *supra,* but to be the more reasonable and just rule. The limitations upon this rule are well illustrated by the *Patrick* case, where the water was wasted for no good reason, and in other of the already cited cases where such water was taken and appropriated for commercial purposes by one to the exclusion of other landowners. Nothing of that kind appears in this record.

The fact is well established that the appellant city was making a reasonable use of its own property, and that the draining of the gravel pit was for the reasonable and proper purpose of extracting the gravel for use. Apparently, the gravel pit property was valuable for no other purpose than that of producing gravel and the city, being the owner, had, we think, under the reasonable use and correlative rights doctrine, a legal right to so drain the gravel pit as to

460

make the product thereof available for use without thereby incurring any liability to others.

Reversed, with directions to dismiss the consolidated action.

ALL CONCUR.