[No. 40129.    En Banc.    December 31, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. HAROLD J. PONTEN *et al., Defendants,* HARRY D. STAINER *et al., Appellants.*\*

\*Reported in 463 P.2d 150.

*Myers, Reiley & Annis,* by *Eldon H. Reiley,* for appellants.

*The Attorney General* and *Delbert W. Johnson, Assistant,* for respondent.

HILL, J.—This is an appeal from the judgment of the Spokane County Superior Court dismissing an action by the State of Washington, and holding that the state was not liable for the loss of water in wells of certain property owners, caused by an excavation for a freeway.[1]

There is no dispute as to the facts as found by the trial court, and we quote findings Nos. 2, 3 and 4 verbatim; other essential findings will be paraphrased.

Each of the defendants had, prior to the fall of 1962, upon his described lands one or more domestic water wells of various depths and the water from such wells was useful and used upon said lands. These wells provided adequate water supply at all times not only for the defendant's [*sic*] household needs but also to irrigate their lawns and gardens. Most of the wells were shallow, being from 10 to 20 feet in depth. Natural basalt rock formations and other materials form a solid, impervious layer a small distance beneath the surface of the ground throughout the Garden Springs area. This impervious layer is shaped much like a large saucer or basin; the raised rim of which, consisting of basalt formations, protrudes above the surface of the ground and marks the boundaries of the Garden Springs area. Prior to the fall of 1962 the impervious layer caused the natural waters flowing through the area to be held back and collect in the basin and saturate the porus [*sic*] materials above the impervious layer forming an underground reservoir underlying the Garden Springs area. The outlet flow from the basin was impeded by the eastern rim of the

---

[1]As the result of an excavation for a freeway, the water table was lowered in certain adjacent properties. This was long after the original condemnation or acquisition of the right-of-way. Rather than forcing individual property owners to wage inverse condemnation actions, the state quite commendably sought a declaratory judgment to determine first its liability, and then, if it was liable, the amount of the damages. See note 3.

impervious material which acted as a natural dam holding back the water and maintaining the reservoir. This reservoir established a water table in the Garden Springs area which was very close to the surface of the ground and in many places the water broke through the surface in the natural springs from which the area derived its name. Recharge of the waters in said basin occurs by percolation from surrounding lands fed in part from precipitation and partially from seepage loss from a small stream, traversing the basin. The basin is also drained by the same creek and springs, however, the outlet flow from the basin was impeded on the east by a rim of impervious material which acted as a natural dam holding back the water and maintaining the reservoir. The general location and extent of the Garden Springs water table was well known and the basalt outcroppings that marked its general boundaries were clearly visible.

Finding of fact No. 2.

In preparation for construction of a 6-lane interstate, freeway approaching Spokane from the west, as a part of the State's preliminary engineering investigation, test wells and holes were dug by the State within the area in which said domestic water wells are located to ascertain the subsurface conditions and to determine the effect upon defendants' wells that might be anticipated by the State's proposed plan to locate and construct a highway and excavate for it in that vicinity. In an effort to prevent the interception and drainage of groundwater from the shallow wells in the vicinity of the State's proposed highway cut, its engineers planned and caused to be constructed at a cost to the State of $35,016.80 an impermeable clay dike between the area of the proposed highway cut and defendants' wells. Prior to excavation of the highway cut, a trench was dug to the depth of the top of the basalt rock and the trench was backfilled and compacted with Latah Clay to form an impervious dike.

It was the reasonable expectation of the State's professional engineers and geologists that construction of said dike would prevent the escape of groundwater and preserve the water table within the basin and the water level in defendants' wells.

Finding of fact No. 3.

After construction of the dike was completed, excava-

tion of the highway cut was commenced.[2] While it was not known to the State, and not reasonably to be expected, the basalt rock underlying the water basin was porous, weakened or fractured, permitting water in the basin to underflow the dike and escape. As a consequence of the highway excavation and removal of the overburden to the level of the basalt rock layer and a portion of the rock lip of the basin and notwithstanding the State's efforts to prevent the same as herein described, water escaped into the cut and water levels in the shallow wells began to lower. The wells of some of the defendants, specifically those appearing for trial, went dry and the wells of some of the other defendants suffered a reduction in the water level.[3] Also, as a result of the construction of the dike, not reasonably to be expected, the recharging of the percolating waters of the basin south of the highway cut was interfered with, causing further reduction of the water in wells of the defendants appearing for trial.

Finding of fact No. 4.

In addition to its construction of the dike, before beginning its excavation the state made other efforts at considerable expense but without success to preserve the water for the benefit of the defendants who are the appellants here. It has also jointly with the city of Spokane extended the city water mains to the Garden Springs area, making that source of water available to the defendants, but assuming no obligation for the cost of connection[4] or for any water

---

[2]Finding of fact No. 7 indicates that the excavation for this cut had "a centerline depth of approximately 28 feet below the adjacent lands."

[3]Many wells in the area were not affected. The appellants' brief points out that the state's complaint was "served on approximately sixty defendants, being every person who had an interest in land in the vicinity here affected. Only eleven defendants, the appellants here, contested the case as they were the only ones who had actually suffered appreciable water loss."

[4]"In order to connect the defendants' homes to the water mains, it is necessary to dig a ditch five feet in depth from the homes across the defendants' property to the main, lay a water pipe in the ditch, and make the necessary connections. This expense would have to be borne by the defendants." (Finding of fact No. 10). Appellants' brief states that the city is making a flat charge of $300 for the necessary connections.

subsequently purchased. To again quote the findings: "Since the loss of the well water, some of the defendants have connected their properties to the City water mains and others have and still do borrow water from their neighbors." Finding of fact No. 10.

There is a specific finding that:

The ground water which fed defendants' wells did not flow in a confined channel through an underground cavern, opening or stream but filtered and flowed interstically through the porous ground of the basin.

Finding of fact No. 9.

It is, therefore, clear that the law applicable to this case is that relative to the diversion or loss of percolating waters.

There is another specific finding that:

During the construction of the described cut, some of the materials required blasting prior to excavation and removal thereof. The blasting done by the State's contractor had no effect on the wells of defendants. It was the fact of removal of the rock, not the method of removal that caused the water to drain away.

(Finding of fact No. 8.)

This serves to remove the issue of any liability of the contractor for negligence in performance of the work, thus making it possible to distinguish the case of *Patrick v. Smith,* 75 Wash. 407, 134 P. 1076 (1913);[5] and leaving clear-cut the issue of the liability of the state for the diversion of the water by reason of the excavation which it made on its own property in the construction of the freeway.

As indicated in the opening paragraph of this opinion, the trial court made the following conclusion of law:

The State, having made reasonable use of its own lands, it not liable to nearby owners for resulting reduction of the water table and consequent loss or reduction of water in the wells of defendants.

---

[5]In the cited case we affirmed a judgment against a contractor for the loss of water in a well caused by a heavy blast while clearing a right-of-way for a railroad.

468

If the state were just another property owner making proper and reasonable use of its own property, and if that use occasioned a diversion of percolating water on nearby property, it would be damnum absque injuria, and the trial court should be affirmed. The trial court in an able memorandum decision cites our cases of *Evans v. Seattle,* 182 Wash. 450, 47 P.2d 984 (1935) and *Wilkening v. State,* 54 Wn.2d 692, 344 P.2d 204 (1959) in support of its decision, and these cases will be hereinafter discussed and distinguished.

■■ As we have indicated, the facts are not in dispute; nor do we disagree with the law as stated when applied to the usual landowner making a reasonable use of his own property. However, we do not agree that the state is such a landowner making such a use. Some examination of how the law developed, and why it is what it is becomes necessary to make our position clear. In the *Evans* case we made our most extensive foray into the law of percolating water, and made the traditional explanation of the distinction between the law applicable to subterranean water courses (which is similar to that applicable to a natural water course on the surface) and the law applicable to underground percolating waters.

In *Evans,* we definitely aligned Washington with those states recognizing the correlative rights of landowners in the percolating water underneath their lands. We quoted Farnham on Water and Water Rights, which quotation merits repetition.[6]

Among the many authorities cited in the *Evans* case was

---

[6] ' "The later and better considered cases are beginning to recognize correlative rights in percolating waters and confine landowners to a reasonable use of it. . . . In all cases where there is a community ownership of, or common right to, the enjoyment of a natural product, the rule is that one of the joint owners can make only a reasonable use of his interest so as not unnecessarily or unreasonably to injure or destroy the equal rights of the co-owners. This rule should apply to the subject of water from a saturated stratum extending under the property of several owners. And this is the rule which has been applied by the great weight of authority." 3 Farnham, Water and Water Rights, p. 2718. . . .' " *Evans v. Seattle,* 182 Wash. 450, 47 P.2d 984 (1935) at 457.

*Meeker v. East Orange,* 77 N.J.L. 623, 74 A. 379, 25 L.R.A. (n.s.) 465, 134 Am. St. R. 798 (1909). The opinion in that case, by Chancellor Pitney, is comprehensive and compendious. It traces the development of the law of percolating waters from the English and early American cases holding that the owner of land had absolute title to everything underneath his land to the more recent holdings indicative of correlative rights in percolating waters. The following summarizing paragraph from that opinion is an excellent statement, at 638:

Upon the whole we are convinced, not only that the authority of the English cases is greatly weakened by the trend of modern decisions in this country, but that the reasoning upon which the doctrine of "reasonable user" rests is better supported upon general principles of law and more in consonance with natural justice and equity.

We therefore adopt the latter doctrine. This does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation or otherwise, nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted. But it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it results therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of sub-surface water upon his land, or if his wells, springs or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage or other legitimate uses.

It is our view that in this case the state is not a landowner making such a beneficial use of its property as judges and text writers have in mind when they are discussing correlative rights in percolating waters. The use the state intended to make and is making of the land it acquired is an entirely artificial one and not one contemplated in any consideration of the natural and beneficial uses to which the land might be put.

There is abundant supporting authority for this position. As early as 1887 the Supreme Judicial Court of Massachusetts laid to rest the idea that a public agency acquiring land for a public use could divert the percolating waters from its neighbors' land without compensation by relying on its rights as a neighboring landowner. A municipality had acquired land for a sewer line, and by its excavation caused a well on nonadjacent property to go dry. The town contended it could claim damnum absque injuria because it was using its own land for its own purposes. The court pointed out that the town did not stand in the position of a purchaser of the property taking all the rights of the grantor, but as one who is authorized to acquire the land for a specific purpose. The court said: "In exercising its rights, the town acts, not under the title of the owner, but by virtue of the authority given by the statute, and under the obligation imposed by the statute to pay all damages occasioned thereby." *Trowbridge v. Brookline,* 144 Mass. 139, 142, 10 N.E. 796 (1887).

The Supreme Court of the United States reached the same conclusion in 1893. The government condemned a right-of-way for a tunnel to carry water to Washington, D.C. As a result of the construction, the plaintiff's well went dry. His property was not adjacent to the right-of-way, but was some 500 feet away. The court held that the plaintiff could recover for the loss of water from his well, pointing out that when the government exercises the power of eminent domain, it does not act as an ordinary landowner, and cannot claim the ordinary landowner's immunity for such damages under the doctrine of damnum absque injuria. *United States v. Alexander,* 148 U.S. 186, 37 L. Ed. 415, 13 S. Ct. 529 (1893).

A case somewhat similar to the one now before us is *In re Appropriation of Easements for Highway Purposes,* 109 Ohio App. 6, 163 N.E.2d 181 (1958). Property was there taken for a permanent highway easement. The excavation for the highway removed the exterior seal of soil and clay from an underground reservoir—which was the only water supply for a considerable tract. There, as here, the state

was contending that it was just an ordinary adjacent owner. The court said, at 8:

The Director of Highways is in an altogether different position from an ordinary adjacent owner and operates upon a different principle. There is no authority for an individual owner to take or occupy his neighbors' land, use it as he will and pay no compensation.

By the right of eminent domain which the people have granted in the Constitution, the government acquires an extraordinary right to take private property for public purposes . . .

Very similar language was used by the Vermont Supreme Court in *Winooski v. State Highway Board,* 124 Vt. 496, 500, 207 A.2d 255 (1965), the court saying: "But the defendant highway board in the exercise of its power of eminent domain is not an adjacent landowner in the usual or customary sense." The highway board was there held liable for the loss of a well, as a result of highway construction.

We will not labor further what seems to us an obvious distinction between the state in its acquisition of property for a special use under its power of eminent domain and a landowner in the usual or customary sense.

The *Evans* case is distinguished on the basis that there the city had not exercised the right of eminent domain, but had purchased a tract of 43 acres which had been in use for a considerable period as a gravel pit and which was not susceptible of any other profitable use. Its proper development required ditching which diverted percolating waters from the wells of the plaintiffs, who were adjoining property owners. The diversion of water caused by the natural development of the gravel-bearing property was properly held to be damnum absque injuria. The city made no use of the property other than any private owner would have made.[7]

---

[7]We have here distinguished the *Evans* case, but have made no reference to the *Wilkening* case. That case is completely different factually in that it deals with raising the water table rather than lowering it; and with the effect of an improvement made by the state (fills for parkways adjacent to Capital Lake in Olympia) rather than

In the present case the state acquired, either by eminent domain or purchases made under threat of it, such land in the Garden Springs area as it needed for its 6-lane freeway. It was not particularly interested in the character of the land, as to whether it was lush or arid or as to what was beneath the surface, except as it presented engineering problems in supporting tons of concrete over which motor-driven vehicles might travel.

The law of percolating waters contemplates no such use of the land above the waters. It was designed and developed to give landowners in an area correlative rights in the percolating waters beneath the surface in connection with the reasonable and anticipated uses of their respective properties. The fact that the state had no use for the percolating waters underneath the land used for its 6-lane freeway, except to divert it, gave it no right to divert and waste[8] the percolating waters from the neighboring properties.

That there is a property right (correlative though it may be) in percolating waters is well established. The state in this case caused the loss of the percolating waters of other landowners for no beneficial use on its own land. It comes into court asking for a declaratory judgment as to its status[9] and liability, if any. It is in this situation a condemnor taking valuable property for a public use which is completely foreign to its highest and best use. The state is

---

with damages caused during the construction. While the opinion speaks of percolating water, the damages occurred after the water ceased to percolate and came to the surface in numerous springs. It was the inadequate drainage of the percolating water after it reached the surface of which Mr. Wilkening complained. The authority relied on by the trial court was *Cass v. Dicks,* 14 Wash. 75, 44 P. 113 (1896), a surface water case, and this was likewise the basic authority on the appeal.

[8]The findings make no mention of how the state disposes of the percolating waters it diverts, but the appellants' brief indicates that it is drained off and dumped in Hangman's Creek.

[9]The state seeks the status accorded it by the trial court of an ordinary owner of the land putting its property in the Garden Springs area to a reasonable use. The defendants-appellants urge its status is that of a condemnor taking their valuable property rights.

in no sense a landowner entitled to divert the percolating water of other landowners in the area for a beneficial use of its own.

The judgment of dismissal is reversed; liability of the state for its taking of the defendants' percolating water is established; and the cause is remanded for a determination of the damages sustained by the 11 property owners who have appeared and defended this action and are the appellants here. The state is, of course, entitled to show in mitigation of damages that another source of supply has been made available, albeit a more expensive and perhaps less desirable one.

HUNTER, C. J., FINLEY, WEAVER, ROSELLINI, HAMILTON, HALE, and McGOVERN, JJ., concur.

NEILL, J. (dissenting in part)—The majority rationale creates an exception to the reasonable use of land doctrine as enunciated in *Evans v. Seattle*, 182 Wash. 450, 47 P.2d 984 (1935). That doctrine is paraphrased by the majority, stating that

> If the state were just another property owner making proper and reasonable use of its own property, and if that use occasioned a diversion of percolating water on nearby property, it would be damnum absque injuria, and the trial court should be affirmed.

However, it concludes that this rule does not apply in the present case. This conclusion seems based upon two premises; first, that the state is not in the same position as a private landowner when it has acquired the land either by or under threat of eminent domain; and, alternatively, that construction of a freeway is not a reasonable use of state's land. I have difficulty with each of these premises.

The majority distinguishes *Evans* on the basis that there the public agency acquired title to its land by purchase rather than by eminent domain or the threat of it. Such a distinction has no basis in reality. Where a purchase of land by a public agency is being negotiated, the threat of condemnation constantly hangs over the bargaining table.

Once the state has attained the position of landowner, I

fail to see any rational basis for assigning different incidents of ownership depending on the manner of acquisition. Either the state is a landowner or it is not. Having paid a judicially determined fair price for the land, the state should occupy the same status as owner that a private citizen would enjoy or that the majority would grant in those instances where the state has obtained the land through private negotiation. To hold otherwise is to treat public agencies as continuing condemnors, even when they are making such use of their land as would not subject a private owner to liability. This result is contrary to our rule that the state will not be treated as a condemnor when doing things that would not be regarded as an actionable taking or damaging if done by a private citizen. *See Wilkening v. State*, 54 Wn.2d 692, 344 P.2d 204 (1959); *Taylor v. Chicago, Milwaukee & St. Paul Ry.*, 85 Wash. 592, 148 P. 887 (1915); *Smith v. St. Paul, Minneapolis & Manitoba Ry.*, 39 Wash. 355, 81 P. 840 (1905).

It may be that I am misunderstanding the majority as placing emphasis on the manner of acquisition. Perhaps the second premise underlies the first—that a given use is unreasonable and thus renders the public body a condemnor rather than a landowner as to that use. Assuming the asserted unreasonableness, I do not believe that this justifies a judicially imposed mutation from landowner to condemnor. There is no need for it. If the use is unreasonable, the reasonable use doctrine does not apply and the landowner, public body or private citizen, is liable to neighbors for deprivation of their water. To say that such use causes the state to revert from the status of owner to that of condemnor is to impose a distinction without a difference between public and private landowners. This is to further confuse an already difficult area of the law, with no corresponding benefit that I can see.

Nor do I concur in the majority's second premise—that construction of a freeway is per se an unreasonable use of the land. It is true, as the majority notes, that a private landowner would not ordinarily construct a freeway on his land. Neither would he construct a transit system, a sub-

way, a sewage disposal plant, or any of the myriad other public works that we associate with government. But I do not agree that, since this use (freeway construction) would be *unusual* for a private landowner, it is, therefore, *unreasonable* for a public body.

Furthermore, I fail to see any logical distinction between the excavation made by the state in the highway construction and excavations that a private owner might make. If a private owner excavates to 15 feet for a sub-basement and a public body excavates a like depth for a highway, why is the former reasonable but the latter unreasonable? If a farmer drains his swamp in order to obtain tillable land and the state drains land in order to build a college, why is the former reasonable but the latter not? The distinction eludes me. Its application to other cases will be difficult for the courts, vexing for the litigants and costly to public bodies and private citizens alike.

I recognize that there may be good reason to establish a rule whereby the state, with its ability to spread the costs among all citizens, is required to recompense a private citizen who has lost his water supply by action of a public agency, which loss would be nonactionable if caused by a private landowner. But such rule is not required by the constitution. This court has neither the ability nor the means to test the desirability or the consequences of creating such a rule. In such areas as this, the consideration is best left to the committee rooms and halls of the legislature. However, I believe that the legislature has considered this matter and has created rules which may be applicable to these parties. I have reference to our ground water code which precludes the reasonable use doctrine as to non-percolating ground water.

Our ground water code (RCW 90.44) was enacted in 1945. Its scope is shown by the definition of ground waters in RCW 90.44.035:

All bodies of water that exist beneath the land surface and that there saturate the interstices of rocks or other materials—that is, the waters of underground streams or channels, artesian basins, underground reservoirs, lakes

or basins, whose existence or whose boundaries may be reasonably established or ascertained—are defined for the purposes of this chapter as "ground waters."

RCW 90.44.040 declares that ground waters are subject to appropriation for beneficial use under the terms of the statute and not otherwise. Other sections of the chapter provide that one who appropriates ground water in accordance with the terms of the statute has a vested right in the amount of his appropriation, and that subsequent appropriators are limited to an amount that will maintain and provide a safe sustaining yield in the amount of the prior appropriation. Procedures are established for claiming rights to the use of water for settling disputes among water users, and for assuring that beneficial use of water is currently maintained.[10]

The trial court concluded that the ground water code does not apply in this case. The basis of that conclusion is expressed in the memorandum opinion. The court said:

> This statute [RCW 90.44] applies to cases involving the competitive or conflicting use of water. That is not the situation in this case. To hold otherwise would be to overrule the Evans case and do away with the reasonable use of land doctrine. This does not appear to be the intent of the Act. . . Language found in Wilkening v. State, supra, which was decided subsequent to the enactment of the ground water statutes, seems to indicate that that statute is not applicable in situations such as we are concerned with here. In that case one of the questions involved was the interference with the water table and the use of the water, but the court held that any resulting damage from such interference was damnum absque injuria.

---

[10]This act reflects legislative recognition of the importance of water rights, water use, and the difficulty in administration of the state's water resources caused by inadequate records. This recognition is made more obvious by RCW 90.14 (1967), as amended by Laws of 1969, Ex. Ses., ch. 284. That statute provides that *all* persons claiming the right to use ground or surface waters must file statements of claim by June 30, 1974. Failure to do so is conclusively treated as a waiver of the claim.

The thrust of these statutes is toward a treatment of water rights that comports with the increased relative importance of those rights.

I read the statute otherwise. The ground water code is comprehensive in scope. Its purpose is to encourage and protect the beneficial use of our state's ground water resources. The increasing scarcity of water resources renders them far more important today than they have been in the past. The statute contains no language limiting its application to conflicting use cases. To the contrary, an intent to protect beneficial use of water from all subsequent deprivation is indicated by the fact that the statute safeguards against willful or negligent waste of ground water (RCW 90.44.120). *Evans v. Seattle, supra,* involved percolating waters which are not controlled by the ground water code. As to nonpercolating ground waters, the rule of reasonable use of land enunciated in *Evans* no longer applies.

Subsurface waters are either "ground waters" within the definition of RCW 90.44.035, or they are percolating waters. As we noted in the case of *Wilkening v. State, supra,* all underground waters are presumed to be percolating. To overcome this presumption, it must clearly appear that the waters in question are statutory "ground waters." In *Wilkening,* this threshold presumption was not overcome and the ground water code did not become relevant. In the present case, however, the record shows that the waters in question are "ground waters" within the meaning of the statute. To demonstrate this, we refer to the trial court's unchallenged findings of fact. In relevant part, they state:

> Natural basalt rock formations and other materials form a solid, impervious layer a small distance beneath the surface of the ground throughout the Garden Springs area. This impervious layer is shaped much like a large saucer or basin; the raised rim of which, consisting of basalt formations, protrudes above the surface of the ground and marks the boundaries of the Garden Springs area. Prior to the fall of 1962 the impervious layer caused the natural waters flowing through the area to be held back and collect in the basin and saturate the porous materials above the impervious layer forming an underground reservoir underlying the Garden Springs area. The outlet flow from the basin was impeded by the eastern rim of the impervious material which acted as a natural dam holding back the water and maintaining the

reservoir. This reservoir established a water table in the Garden Springs area which was very close to the surface of the ground and in many places the water broke through the surface in the natural springs from which the area derived its name. Recharge of the waters in said basin occurs by percolation from surrounding lands fed in part from precipitation and partially from seepage loss from a small stream, traversing the basin. The basin is also drained by the same creek and springs, however, the outlet flow from the basin was impeded on the east by a rim of impervious material which acted as a natural dam holding back the water and maintaining the reservoir. The general location and the extent of the Garden Springs water table was well known and the basalt outcroppings that marked its general boundaries were clearly visible.

Finding of fact No. 2.

The ground water which fed defendants' wells did not flow in a confined channel through an underground cavern, opening or stream but filtered and flowed interstially through the porous ground of the basin.

Finding of fact No. 9.

On the basis of these findings, the trial court concluded that the waters are percolating waters. I believe that he erred in so concluding. The trial court's findings of fact place the underground waters in this case squarely within the statutory definition of ground waters. Apparently the trial court concluded that the ground water code does not apply except in competing water use situations; but, as discussed above, the code is comprehensive in scope and protects beneficial use against subsequent waste as well as against subsequent competing appropriation. Defendants are thus within the protection of the statute, both as a matter of general interpretation and specifically as regards the nature of the water involved.

The defendants' water was removed, whether by total depletion or a lowering of the water table[11] is not shown by the record. While the ground water statute may be considered inapplicable to situations where the water supply is

---

[11]*See Wayman v. Murray City Corp.*, 458 P.2d 861 (Utah 1969).

not depleted *(see, e.g., Wilkening v. State,* 54 Wn.2d 692, 344 P.2d 204 (1959), it can hardly be argued that the statute does not protect prior appropriations of ground water from loss by removal of the water. That is the case here.

The record is devoid of findings of fact or conclusions of law as to defendants' status as prior appropriators under the ground water code. Accordingly, I would remand, with instructions that the trial court determine the rights of the parties to these ground waters under RCW 90.44.

