[No. 39979.    En Banc.    January 15, 1970.]

ODDMUND BJORVATN *et al., Respondents,* v. PACIFIC
MECHANICAL CONSTRUCTION, INC., *et al., Appellants.**

*Guttormsen, Scholfield, Willits & Ager,* by *Frank D. Howard,* and *Thomas D. Frey,* for appellants.

*Young & Hoff,* by *Victor V. Hoff,* for respondents.

HALE, J.—When the Bjorvatns bought their house on Sand Point Way Northeast in Seattle in 1962, they knew it had been badly damaged by a sinking of the land. They did not expect, however, that, years after they had repaired and restored the house, the construction of a sewer nearby would produce a similar damage. They bring this action against the Municipality of Metropolitan Seattle and the sewer contractor for injuries to their house and land.

Oddmund Bjorvatn looked over the property at 9509 Sand Point Way Northeast carefully before he bought it in 1962. He saw that the land beneath the house had settled through the years producing cracks in the basement and house walls and causing the basement and house floors to slope and the fireplace to separate from the wall. In one place, he observed that the basement floor had sheared off

*Reported in 464 P.2d 432.

and had been repoured to floor level. Despite its damaged condition, Bjorvatn decided to buy the house and restore it.

In the present case, the trial court had to determine the cause and nature of the original settling. It found that the house, built in 1946 or 1947, had settled because of the compressible character of the soils on which it stood, but that the settling process, although persisting through the years, had ended by 1960. Thus, by the time the Bjorvatns bought the property in May, 1962, the settling had ended, and the lot and subsoil were then stable and in a state of equilibrium although the soil retained its compressible character. The court in its findings characterized this phenomenon as a delicate state of equilibrium because "it was resting upon compressible soils."

Between May, 1962, and the end of 1963, Mr. Bjorvatn made the house level, installed a new fireplace, filled and repaired all cracks, and hauled in fill material for and built a new patio at the rear of the house. In doing this work, he utilized the old footings for the building, fireplace and chimney. In October, 1964, after the Bjorvatns had completely restored the house and were living in it, defendant Municipality of Metropolitan Seattle—commonly called Metro—began construction of a trunk sewer in Metro's property adjoining on the north and in a Seattle right-of-way adjoining Bjorvatns' on the east. The trench was unusually deep, running to a maximum depth of 36 feet in both these areas to the north and east of the Bjorvatns' property.

During the excavation and filling operation, the defendants operated on the sewer site heavy earth moving and digging machinery which produced considerable vibration. The court found, however, that the 36-foot deep sewer trench was below the level of the subterranean ground water table; that digging the sewer trench caused a lowering of the water table and increased, as the engineers describe it, the effective load upon compressible soils supporting Bjorvatns' foundation; and that these forces were a proximate cause of the Bjorvatns' house settling anew. It is clear from a reading of this record that the trial court was

convinced and found that a combination of forces, *i.e.,* heavy machinery, vibration, and a deep trench, which deprived the Bjorvatns' compressible subsoil of its natural water content, all combined to produce a sinking of the Bjorvatns' foundation and the consequent damage. By April, 1965, defendants had finished excavating and completely refilled the sewer trench in the vicinity of the Bjorvatns, leaving their house in a damaged condition. The fireplace was cracked and the chimney pulled away from the wall. The excavating and refilling also cracked the concrete foundation walls, put cracks in the plaster, and unleveled the floors.

Deeming this a damaging of private property by a condemnor for public use without just compensation under the ninth amendment to the state constitution, the court granted plaintiffs judgment in the amount of $5,000. Defendants contend that this was not a damaging of property for the public use, but rather a rightful impeding or obstructing of the flow of subterranean waters. They rely largely on the rationale of *Evans v. Seattle,* 182 Wash. 450, 47 P.2d 984 (1935), in which opening a ditch in a gravel pit drained away an underground spring and streams that supplied water to adjoining property owners. There, plaintiffs brought an action to recover for the total loss of underground percolating waters, but this court, holding the loss to be damnum absque injuria, denied recovery. *See, also,* to that effect, *Wilkening v. State,* 54 Wn.2d 692, 344 P.2d 204 (1959).

█ We adhere to these principles and recognize that as a general rule loss or inconvenience caused by interference with the natural movement of percolating waters which results from lawful and proper uses of, or operations upon, the containing land is damnum absque injuria unless liability has been created by statute. 56 Am. Jur. *Waters* § 120 (1947). But it should be observed that this rule applies only under circumstances where damage results from no more than a rightful appropriation or diversion of the percolating waters.

The freedom to interfere with percolating waters in the lawful and reasonable use of one's property was recently

sustained but deemed inapplicable in *State v. Ponten,* 77 Wn.2d 463, 463 P.2d 150 (1969). We there held that the state, as condemnor, was not simply a landowner making a proper and reasonable use of its land when, in building a highway, it diverted and disposed of percolating waters to the damage of nearby owners. We said:

> If the state were just another property owner making proper and reasonable use of its own property, and if that use occasioned a diversion of percolating water on nearby property, it would be damnum absque injuria, and the trial court should be affirmed.

The state, in *Ponten,* was not appropriating the water as a landowner in the usual or customary sense but rather in the exercise of eminent domain, diverting it for what the law would deem an entirely artificial use of the land; and the loss of water to nearby landowners in our opinion amounted to a damaging of their property compensable under the constitution. But, unlike the instant case, *Ponten* depended not upon damage produced by removal of lateral or subjacent support, but instead on the idea that the state, in constructing a freeway, made a wholly artificial use of the land for a public use without just compensation having first been made—in violation of Const. art. 1, § 16. We held in *Ponten* that, since a damage had been imposed in the exercise of the constitutional power of eminent domain, the rule of negligence did not intrude; and that if a damaging to real property proximately results from the exercise of that power, it is compensable under ·the constitution no matter how great the care exercised by the condemnor.

An owner in exercising his right to control, manage and improve his land, may take lawful and reasonable action to protect it from surface waters flowing from higher land and the damages caused thereby are deemed damnum absque injuria. *Wilkening v. State, supra.* But that rule has little application to the circumstances of the present case; Metro was not fighting off surface and percolating waters and impeding their flow upon its land as was the situation in *Wilkening.* Even though plaintiffs here might have proved that Metro and the contractor were negligent in producing

excessive vibration, or in keeping the ditch open for an unnecessarily long period, or in covering and reopening it several times, their entitlement to recovery did not depend upon such proof. Plaintiffs' right to recovery here rested not on concepts of negligence but on proving that Metro, as condemnor, in exercising the power of eminent domain for construction of a sewer in adjoining property, inflicted a physical injury, directly and proximately causing damage to the plaintiffs' real property and improvements.

Removal of lateral or subjacent support from adjoining property in the digging of a sewer ditch is a damaging under Const. art. 1, § 16. Whether the damage resulted from a drying out process, a lowering of the water table, a release of physical pressure, or a combination of these and other physical forces, the fact remains that the defendants were not making an appropriation of percolating waters for their own use. They were digging a deep ditch for a public use in property adjoining that of the Bjorvatns and in doing so removed lateral and subjacent supports causing damage. The removal of lateral and subjacent support from adjoining property in the construction of a sewer for a municipality or subdivision of the state is, in our opinion, a damaging of property for a public use for which the condemnor must make just compensation.

We think that this rule accords with our statement in *Muskatell v. Seattle*, 10 Wn.2d 221, 116 P.2d 363 (1941), at 235:

All that appellant was required to plead and prove was that the city, in the construction of its sewer, removed the lateral support of appellant's property, thereby causing sand, silt, or water to be forced out from under appellant's building, directly causing the damage to the building complained of.

The condemnor is liable for damages caused by the removal of lateral and subjacent support, and it is immaterial whether the loss of support has been produced by drainage, release of pressures and weight, or drawing off or lowering of percolating waters or other forces, so long as the digging of the ditch is shown to have been the direct and proximate

cause of the removal. We said this in *Muskatell*, as follows, at 237:

> Whatever the general rule may be in regard to percolating waters, we are of the opinion that, under our constitutional provision, for an action brought for the removal of lateral support, there is and should be no distinction whether, by the removal of the lateral support, sand, silt, quicksand, or water is removed from under the land of the adjoining property owner, directly causing the damage for which complaint is made.

*Accord: Farnandis v. Great Northern Ry.*, 41 Wash. 486, 84 P. 18 (1906). The removal of lateral or subjacent support is an actionable damage. *Knapp v. Siegley*, 120 Wash. 478, 208 P. 13 (1922); *Peters v. Bellingham Coal Mines*, 173 Wash. 123, 21 P.2d 1024 (1933).

Affirmed.

HUNTER, C. J., FINLEY, ROSELLINI, HAMILTON, and Mc-GOVERN, JJ., concur.

NEILL, J. (concurring in the result)—I concur in the result under the rationale of *Muskatell v. Seattle*, 10 Wn.2d 221, 116 P.2d 363 (1941).

WEAVER, J., concurs with NEILL, J.