**Berry BALL**

v.

**The UNITED STATES.**

**No. 468–79L.**

United States Claims Court.

Nov. 12, 1982.

*Brothers Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

Jack Cyr, Jr., Bremerton, Wash., for plaintiff.

Ronald G. Gluck, with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

WOOD, Judge:

In this action, before the court on plaintiff's and defendant's motions for summary judgment, plaintiff seeks just compensation for an alleged Fifth Amendment taking of property. Defendant denies any taking, and asserts that the petition should be dismissed.

Upon consideration of the pleadings, briefs and affidavits of the parties, and without oral argument, both plaintiff's and defendant's motions for summary judgment are denied. Absent appropriate disposition of the case in the interim, the parties shall timely and fully comply with the requirements toward trial specified in Section III of the Opinion.

I

From the record as it now stands, it appears that in mid-1977 plaintiff owned, and he and his wife resided upon, certain real property ("the property") abutting, and apparently south of, the boundary line of the United States Naval Submarine Base ("the Base"), Bangor, Washington.[1] A shallow concrete cylinder well on plaintiff's property, termed by plaintiff an "artesian well" fed by an "artesian vein," was located on the side of a hill about 100 feet from the Base boundary line. As of mid-1977, the well provided abundant water for plaintiff's domestic needs, and for at least some agricultural uses as well.

Clear Creek, a salmon spawning ground, ran through the Base near its boundary with the property. In general terms, that area of the Base was quite swampy in 1977, in part because of surface run-off of water resulting from prior Naval construction of on-Base housing and related facilities. Moreover, the run-off was eroding the banks and bed of Clear Creek, and sand and silt were covering the gravel in the creek bed in which salmon spawned.

In August 1977, the Navy began construction of a Storm Water Retention Facility ("the Facility") to control such surface run-off. The Facility, near the Base boundary line (and plaintiff's well), consisted of a concrete spillway and two retaining ponds. During construction of the spillway and its underlying drainage system, the contractor, Tri-State Construction, drilled five 40-foot dewatering wells to lower the water table in the area and thereby to facilitate construction. The spillway, and the dewatering wells, were some 300 to 500 feet or so from plaintiff's well, on government property. Operation of the first of the dewatering wells began about August 20, 1977.

About two weeks after the dewatering operations began, plaintiff noticed a significant diminution in his well water supply. He concluded that the drop in water supply

---

1. The petition alleges that plaintiff is the "owner in fee simple" of the property, and defendant makes no argument otherwise. The papers on file herein suggest that plaintiff inherited the property from his mother.

was caused by construction of the Facility, and met with Tri-State's project superintendent to discuss the situation. Shortly thereafter, Navy personnel inspected plaintiff's well, and the Navy agreed to, and from about September 1977 to perhaps January 1978 did, truck water to the property for plaintiff's use.

In January 1978, as the Facility neared completion, dewatering operations on the Base ceased. Plaintiff then asserted (and here contends) that, notwithstanding the cessation of such operations, the amount of water available from his well failed to return to the abundant level existing prior to the Navy's construction (and dewatering) operations. Plaintiff first sought relief from the Navy, to no avail. He then filed a claim against defendant, under the Federal Tort Claims Act, in the United States District Court for the Western District of Washington; that suit was dismissed by the District Court December 21, 1978.[2] This action, founded on Section 1491, Title 28, United States Code, and the Fifth Amendment, followed.

## II

Plaintiff contends that defendant's construction of the Facility caused a perma-nent diminution in the amount of water theretofore available from his well, and amounts to a taking of private property for a public use, in the Constitutional sense. More specifically, by way of affidavits (from Tri-State's project superintendent, and from plaintiff), plaintiff asserts in substance that in constructing the Facility, defendant interrupted, and permanently diverted from plaintiff's well, an "artesian vein," or "underground stream," of water flowing in a well-defined, known, and permanent channel[3] under both the Base and plaintiff's property, and thereby deprived him of a compensable property right.

Defendant rests its denial of any taking, and its claim of present right to summary judgment, on two basic premises. The first is that defendant did not in fact cause any diminution in or interruption to the supply of water to plaintiff's well.[4] The second is that, even assuming *arguendo* defendant caused such a diminution or interruption, the waters involved were (or, perhaps more precisely, must be presumed to have been) percolating waters, and that, in the lawful and reasonable use of its own property, defendant could substantially interfere with, or divert, such percolating waters with impunity.[5]

---

**2.** The facts stated in this sentence are alleged in the petition and admitted in the answer. Defendant makes no arguments based on that dismissal.

**3.** *See, e.g., King County v. Boeing Co.,* 62 Wash.2d 545, 384 P.2d 122 (1963); *McGowan v. United States,* 206 F.Supp. 439, 442 (D.C. Mont.1962); *Wilkening v. State,* 54 Wash.2d 692, 344 P.2d 204 (1959); *Evans v. City of Seattle,* 182 Wash. 450, 454, 456, 47 P.2d 984, 985, 986 (1935). Fairly construed, plaintiff's allegations amount to a claim that *his* "artesian vein" is just such a vein. As the authorities cited in this note demonstrate, however, both plaintiff's contention that "it does not matter, under the applicable case law, whether this was percolating water or an artesian vein," and his implication that any diversion of *any* "artesian vein," whether or not meeting the requirements stated in the text, would suffice to give rise to a right to recovery for a taking, are plainly without merit.

**4.** The record includes an affidavit by the government "Senior Technical Expert" in connection with construction of the Facility (and a professional engineer) that the maximum "Radius of Influence" of dewatering operations on the Base was no more than 222 feet; that plaintiff's well was approximately 500 feet from the nearest dewatering well, and some 600 feet from the Facility; and that, in his opinion, defendant's construction and dewatering operations "should not have adversely affected the water supply available from" plaintiff's well. The record also reflects, however, that shortly after dewatering operations began, a loss of plaintiff's well water supply occurred, and that the Navy trucked water to plaintiff's property throughout all or most of the period dewatering operations were in process. Moreover, no other explanation for what happened to plaintiff's well has been offered by defendant or its engineer.

**5.** Defendant's expert also disputes plaintiff's factual allegations respecting an "artesian vein," contending that there is "no basis in fact" for the view that during construction of the Facility a "permanent interruption" of an "underground river" occurred.

When a genuine issue of material fact is raised, granting summary judgment is inappropriate; and, in considering whether or not such an issue is present, doubts are to be resolved against the moving party. *Garcia v. United States,* 123 Ct.Cl. 722, 732, 108 F.Supp. 608, 613 (1952); *see also Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Coastal Petroleum Co. v. United States,* 220 Ct.Cl. 690, 693 (1979) (where the materials before the court "present a choice as to the inferences to be drawn from the underlying facts, the inferences must be viewed in the light most favorable to * * * the party opposing the motion" for summary judgment).

With respect to plaintiff's motion for summary judgment, genuine issues as to the material facts plainly exist. Among other things, plaintiff's assertion that defendant was responsible for the diminution in the theretofore existing supply of water to plaintiff's well, and whether the source of that supply of water was an artesian vein or underground stream, as those terms are defined hereinabove, are sharply controverted. Accordingly, plaintiff's motion for summary judgment must be and is denied.

Defendant's motion too must be denied. On this record, whether or not defendant in fact caused the consequences of which plaintiff here complains is, as just noted, very much in dispute. And, despite defendant's arguments otherwise, the presumption that all underground waters are percolating waters is not, on the record presently before the court, an adequate ground, in and of itself, upon which to base dismissal of plaintiff's petition.[6]

In general terms, water rights in surface waters, whether riparian or appropriative, constitute property and, under familiar principles, cannot be taken "except

for the public use and upon payment of just compensation." 2 Nichols on Eminent Domain § 5.79, p. 5–302 (Rev. 3d Ed. 1981); *see also International Paper Co. v. United States,* 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931); *United States v. Alexander,* 148 U.S. 186, 13 S.Ct. 529, 37 L.Ed. 415 (1893); *United States v. Ahtanum Irrigation District,* 124 F.Supp. 818, 827 (D.C.E.D.Wash., 1953), *rev'd on other grounds,* 236 F.2d 321 (9th Cir.1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957).

Ascertaining the rule of law applicable to subterranean (as distinguished from surface) waters requires a determination whether the subsurface waters involved are "percolating waters" or "underground streams" (more precisely, "subterranean water flowing in a well-defined channel"). 2 Nichols on Eminent Domain, §§ 5.78[1], [2], pp. 5–255–64 (Rev. 3d Ed. 1981); *see also* 93 C.J.S. Waters §§ 86 *et seq.;* 78 Am.Jur.2d §§ 146 *et seq.;* Annot., 29 A.L.R.2d (Subterranean Waters) 1354 *et seq.* (1953).

In general terms, and with respect to percolating waters, the so-called "reasonable use" rule has long been recognized and applied by many courts. *E.g., Evans v. City of Seattle,* 182 Wash. 450, 47 P.2d 984 (1935); *see also* Annot., 29 A.L.R.2d (Subterranean Waters) 1354, 1361–64 (1953). Under that doctrine, a landowner who obstructs or diverts percolating waters on his own land, even to the detriment of his neighbor, is immune from liability therefor if the interference was "in the lawful and reasonable use of one's [own] property * * *."[7] *Bjorvatn v. Pacific Mechanical Constr. Inc.,* 77 Wash.2d 563, 564, 464 P.2d 432, 434 (1970); *see also Wilkening v. State,* 54 Wash.2d 692, 344 P.2d 204 (1959); *cf. State v. Ponten,* 77 Wash.2d 463, 463 P.2d 150 (1969).

---

**6.** Defendant's arguments that plaintiff's affidavits contain "many" misleading, erroneous, and incorrect statements, and that there is "no basis in fact" for the allegation that defendant permanently interrupted an "underground river," show plainly the existence of genuine factual disputes. Moreover, for the purpose of

ruling upon defendant's motion for summary judgment, the disputed facts are clearly material.

**7.** There is no room for doubt but that defendant's construction of the Facility was in the lawful and reasonable use of its own property.

 Waters flowing in a defined and known subterranean stream or channel are, however, generally governed by the same rules of law applicable to natural watercourses or surface streams. *Wilkening v. State, supra;* Annot., 29 A.L.R.2d (Subterranean Waters) 1354, 1373–77 (1953). The owner of land beneath which such waters flow has the same rights respecting those waters as a riparian owner with respect to a surface stream across his property. *Evans v. City of Seattle, supra; See also* 2 Nichols on Eminent Domain § 5.78[2], p. 5–262 (Rev. 3d Ed. 1981).[8]

 It is, of course, well settled that in the absence of a showing that underground waters flow in a permanent, defined, and known channel, such underground waters will be presumed to be percolating waters. *E.g., Wilkening v. State, supra;* 54 Wash.2d at 693, 344 P.2d at 206 (and cases there cited); *McGowan v. United States, supra,* 206 F.Supp. at 442. Moreover, in considering a motion for summary judgment, the court should give the party seeking such a judgment the benefit of any relevant presumptions that would be available to it at trial. *United States v. General Motors Corp.,* 518 F.2d 420, 441–42 (C.A.D.C.1975).

 These propositions, however, are of no real help to defendant in this case. In determining whether or not a motion for summary judgment should be granted, it is not proper for the court to try and resolve genuine issues of material fact upon the basis of the documents before it; the court can properly determine only *whether* such issues of material fact exist. *E.g., Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543 (9th Cir.1975); *see also United States v. General Motors Corp., supra.*

From a careful review of the record in this case, it is concluded that defendant has failed to bear its burden of demonstrating with clarity that no genuine issue of material fact exists. *E.g., Smith v. Nixon,* 606 F.2d 1183, 1187 (C.A.D.C.1979), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), *reh. denied,* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1024 (1981). It may well be, of course, that should trial be held plaintiff will ultimately be unable to meet *his* burden of proving the facts essential to a conclusion that defendant's dewatering and construction activities so impacted upon a valid property right as to amount to a Fifth Amendment taking. At least for present purposes, however, plaintiff has sufficiently demonstrated that genuine and material factual issues in this respect exist. Accordingly, absent some other resolution of this claim, plaintiff is entitled to be heard in open court on such issues.

In light of the foregoing, plaintiff's and defendant's motions for summary judgment are hereby denied.

### III

On March 20, 1981, the trial judge of the United States Court of Claims to whom this case was then assigned issued a pretrial order on liability requiring an exchange of submissions in preparation for trial. If for justifiable reasons, neither party has thus far complied with that order. In the interim, the case has become the responsibility of this court, and it would appear to be in the best interests of plaintiff, defendant, and the court that trial, if and when held, encompass not only liability but also the amount of recovery (if any).

Accordingly, plaintiff is directed to comply with the terms of paragraph 1 of the pretrial order on liability filed herein March 20, 1981, within forty-five (45) days from the date of this opinion.[9] In addition, plain-

---

8. "The rules which apply to surface streams generally are equally applicable to underground streams. * * * such stream may not be diverted * * * to the detriment of neighboring owners under whose land the stream naturally flows. * * * such underground streams may be taken by eminent domain." *Id.* In context, it is quite clear that the "underground streams" referred to are currents of water flowing in a well-defined, known, and permanent channel, not just waters which happen to be underground.

9. The Rules of the United States Claims Court respecting all applicable procedural matters (including service of papers) shall apply to all further proceedings herein.

tiff's pretrial submission shall specify the witnesses upon whom, and the documents upon which, plaintiff intends to rely in establishing the amount of his recovery (if any), as well as the theory (or theories) as to amount of recovery upon which plaintiff intends to rely.

Within forty-five (45) days after service of plaintiff's pretrial submission, defendant is directed to comply with the terms of paragraph 2 of the said pretrial order. In addition, defendant's submission shall specify the witnesses, documents, and theories upon which it will rely with respect to the amount of recovery herein (if any), and shall include an appropriate response to plaintiff's submission on damages.

Within thirty (30) days after service of defendant's pretrial submission, plaintiff is directed to comply with the terms of paragraph 3 of the said pretrial order. Thereafter, the case will (if necessary) be set for trial.

The foregoing is, of course, without prejudice to the right of the parties to settle or otherwise dispose of this case. Extensions of time to comply with the requirements of this Section III will, however, be granted only upon a showing that settlement is, from the standpoint of *both* parties, more probable than not; even in that event, no more than one such extension for settlement purposes, not to exceed sixty days, will be granted, unless the parties can show that settlement has been reached, and that additional time is necessary only to consummate the terms of the settlement.