## FRIENDSWOOD DEVELOPMENT COMPANY et al., Petitioners,

v.

## SMITH–SOUTHWEST INDUSTRIES, INC., et al., Respondents.

### No. B–6682.

Supreme Court of Texas.

Nov. 29, 1978.

Rehearing Denied Dec. 20, 1978.

Fulbright & Jaworski, Kraft W. Eidman, David J. Beck and Simeon T. Lake, III, Robert D. McGee, Houston, McGinnis, Lochridge & Kilgore, Robert C. McGinnis and Peter M. Lowry, Austin, Childs, Fortenbach, Beck & Guyton, Stephen R. Kirklin and Ray T. Fortenbach, Cox, Parkenham & Roady, Joyce Cox, Otis H. King, Houston, for petitioners.

Jamail & Gano, Joseph D. Jamail, S. Gus Kolius and Robert F. Stein, Houston, for respondents.

DANIEL, Justice.

The question in this case is whether landowners who withdrew percolating ground waters from wells located on their own land are liable for subsidence which resulted on lands of others in the same general area.

Smith-Southwest Industries and other landowners located in the Seabrook and Clear Lake area of Harris County brought this class action in 1973 against Friendswood Development Company and its corporate parent, Exxon Corporation, alleging that severe subsidence of their lands was

caused by the defendants' past and continuing withdrawals of vast quantities of underground water from wells on defendants' nearby lands. Friendswood, alleged to be the operator of the wells, joined as third party defendants numerous parties alleged to be withdrawing ground water in the same general area. Friendswood and Exxon moved for a summary judgment against the plaintiffs, and it was granted by the trial court along with denial of relief in the third party actions.

The trial court followed a long-established common law rule that, in the absence of willful waste or malicious injury, a landowner has the right to withdraw ground waters from wells located on his own land without liability for resulting damage to his neighbor's land. The Court of Civil Appeals reversed and remanded, holding that plaintiffs' petition stated a cause of action in nuisance and negligence and that the summary judgment record raises genuine issues of material fact with regard thereto. 546 S.W.2d 890. We reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

Our decision results from what we conceive to be our duty to apply a rule of property law as it existed during the time of the actions complained of in this suit, even though we disagree with certain aspects of the existing rule. As to future subsidence caused by wells hereinafter drilled or produced, this Court, in the manner hereinafter set forth, will recognize and apply the law of negligence along with willful waste and malicious injury as limitations on the present rule applicable to subsidence resulting from withdrawal of underground waters.

*Allegations and Summary Judgment Proof*

The petition of Smith-Southwest, the name by which all of the plaintiffs will be identified, recites that plaintiffs are landowners in the area of Seabrook and Clear Lake, and as a class include all owners of fee simple and leasehold estates along the west bank of Galveston Bay from the north dike of the Houston Yacht Club, following the shore line south to the mouth of Clear Creek and inclusive of the entire shore line of Clear Lake, Armand's Bayou, and Taylor Bayou from the shore line to a contour line with elevation 15 feet above the shore line, except the land owned by the defendants.

The trial court had before it depositions, interrogatories, affidavits and exhibits which showed rather clearly that Friendswood had pumped large amounts of subsurface waters from its own property for sale primarily to industrial users in the Bayport industrial area developed by Friendswood and Exxon. These wells were drilled from 1964 through 1971, even though previous engineering reports to defendants showed that production therefrom would result in a certain amount of land subsidence in the area. Plaintiffs alleged that the wells were negligently spaced too close together, too near the common boundary of lands owned by plaintiffs and defendants, and that excessive quantities were produced with knowledge that this would cause subsidence and flooding of plaintiffs' lands. Plaintiffs alleged that this extensive withdrawal of ground water proximately caused the sinking and loss of elevation above mean sea level of their property and the property of others similarly situated along the shores of Galveston Bay and Clear Lake, resulting in the erosion and flooding of their lands and damage to their residences, businesses and improvements. Plaintiffs further allege that the manner in which Friendswood Development Company continues to use its property for the withdrawal and sale of large amounts of fresh water to commercial users on other lands constitutes a continuing nuisance and permanent loss and damage to their property.

The defendants, Friendswood Development Company and its parent company, Exxon, are sought to be held jointly liable for the damages alleged in this case on the theory that they jointly planned and pursued the operations complained of. Among other defenses, Friendswood and Exxon contend that subsidence was a problem in the area before their operations began and that owners of other water wells through-

out Harris and Galveston Counties caused or contributed to the subsidence. Friendswood's third party action for contribution and indemnity was filed against twenty-two companies and municipalities in Harris and Galveston Counties, alleging that they contributed to any existing subsidence by pumping large quantities of ground water from the common aquifers underlying the lands in question. Plaintiffs concede that subsidence in the area complained of was known to be a "potential problem" before defendants' operations began, but they allege that Friendswood and Exxon knew that the problem "would be severely aggravated" by the withdrawals which the companies contemplated. There was summary judgment proof of such knowledge and aggravation.

Reports in the record and publications of official agencies reflect that land subsidence in Harris County is not peculiar to or confined within the Galveston Bay and Clear Creek areas described in plaintiffs' petition. Rather it is a problem which has existed for many years in Harris and Galveston Counties. Harris County alone had 2,635 ground water wells in the inventory compiled by the U.S. Geological Survey in cooperation with the Texas Water Development Board in 1972.[1] The Chicot and Evangeline aquifers underlie the Houston-Galveston region, which includes all of Harris and Galveston Counties and parts of adjacent counties. These two aquifers furnish all of the ground water pumped in the Houston-Galveston region, according to the U.S. Geological Report prepared by R. K. Gabrysch and C. W. Bonnet in 1974.[2] This report states that water level declines of as much as 200 feet have resulted in wells completed in the Chicot aquifer and as much as 325 feet in the Evangeline aquifer during 1943–73, and "the declines in artesian pressures have resulted in a pronounced regional subsidence of the land surface."[3] It states that the area in which there has been subsidence of one foot or more has increased from 350 square miles in 1954 to about 2,500 square miles in 1973. The contour lines of this area encompass practically all of Harris and Galveston Counties and include all of the principal areas of ground water withdrawals.[4] Maps in the report indicate that the land and wells involved in this suit are in or near the "Johnson Space Center Area," where the land surface subsided about 2.12 feet between 1964 and 1973.[5]

The general and widespread problem of subsidence in Harris and Galveston Counties has been considered in numerous other

---

1. *Ground-Water Data for Harris County, Texas, Volume II, Records of Wells, 1892–1972,* Report 178, Texas Water Development Board, 1974.

2. *Land Surface Subsidence in the Houston-Galveston Region, Texas,* compiled by R. K. Gabrysch and C. W. Bonnet for the U.S. Geological Survey in cooperation with the Texas Water Development Board and the cities of Houston and Galveston, Report 188, Texas Water Development Board, p. 2 (1975).

3. Id. 1.

4. Id. 3, 13. Figure 1 on page 3 delineates the principal areas of water withdrawals with the average rates of pumping in 1972 stated in million gallons per day (mgd). Figure 9 on page 13 contours the level of subsidence within the region during 1943–73. From these maps, the rate of pumping for 1972 and the maximum 1943–73 subsidence may be compared as follows:

| AVERAGE RATE OF PUMPING, 1972 | | MAXIMUM SUBSIDENCE, 1943–73 |
|---|---|---|
| Houston Area | 195 mgd | 3 to 5 feet |
| Katy Area | 125 mgd | 1 foot |
| Pasadena Area | 120 mgd | 7.5 feet |
| Baytown-LaPorte Area | 32 mgd | 5 feet |
| Johnson Space Center Area | 18 mgd | 3 feet |
| Texas City Area | 14 mgd | 4 feet |
| Alta Loma Area | 13 mgd | 2.5 feet |

5. Id. 15.

writings,[6] and more notably by action of the Legislature, which created the Harris-Galveston Coastal Subsidence District in 1975.[7] This is a comprehensive measure "to provide for the regulation of the withdrawal of ground water within the boundaries of the district for the purpose of ending subsidence which contributes to or precipitates flooding, inundation, or overflow of any area within the district . . . ." It includes all of Harris and Galveston Counties and provides for a board of fifteen members with the power to grant or decline permits for new wells, regulate spacing and production, require metering devices, and adopt any rules necessary to prevent further subsidence.[8]

The magnitude of the problem has been reviewed in depth because it is relevant to our determination of whether existing rules of law are applicable and appropriate, or whether new rules should be adopted by this Court or recommended for consideration by the Legislature.

### Nature of Plaintiffs' Action

Plaintiffs have alleged an action in tort based upon the general rule that a landowner has a duty not to use his property so as to injure others—*sic utere tuo ut alienum non laedas.* Storey v. Central Hide & Rendering Co., 148 Tex. 509, 226 S.W.2d 615 (1950); Turner v. Big Lake Oil Co., 128 Tex. 155, 96 S.W.2d 221 (1936); Gulf, C. & S.F. Ry. Co. v. Oakes, 94 Tex. 155, 58 S.W. 999 (1900). The Court of Civil Appeals cited the above cases and this general rule of tort law in holding that plaintiffs were entitled to a trial on the allegations of nuisance and

negligence. The problem is that those cases, none of which related to ground water withdrawals, involved liability for the *unreasonable use* of correlative property rights or the balancing of legal and equitable rights between property owners. This is a concept which was deliberately rejected with respect to withdrawals of underground water when this Court adopted the common law rule that such rights are not correlative, but are absolute, and thus are not subject to the conflicting "reasonable use" rule. *Houston & T. C. Ry. Co. v. East,* 98 Tex. 146, 81 S.W. 279 (1904).

Plaintiffs insist that this is not a case involving conflicting claims to the ownership or nontortuous use of water and that, therefore, the "archaic and awkward" common law rule adopted in *East* as to "absolute" ownership should not insulate the defendants from damages due to nuisance in fact or negligence in the manner by which they made use of their property. This is, in effect, a contention that the "reasonable use" doctrine should apply to ground water the same as it does to other real property.

The plaintiff in *East* argued for the "reasonable use" rule in that case, and it was adopted by the Court of Civil Appeals. *East v. Houston & T. C. Ry. Co.,* 77 S.W. 646 (Tex.Civ.App.1903, error granted). In that case the railroad company, with full knowledge of the long existence of Mr. East's small shallow well on his homestead, dug a well twenty feet in diameter and 66 feet deep on its own adjacent property, from which it pumped 25,000 gallons of water per day. This resulted in lowering the water level on plaintiff's land and dry-

---

**6.** See Winslow and Wood, *Relation of Land Subsidence to Ground-Water Withdrawals in the Upper Gulf Coast Region, Texas,* Mining Eng., October 1959, pp. 1030–1034; Wood and Gabrysch, *Analog Model Study of Ground Water in the Houston District, Texas,* Bulletin 6508, Texas Water Rights Commission, 1965; *Land Subsidence in the Houston Gulf Coast Area,* A Report to the 64th Session of the Texas Legislature by the Gulf Coast Waste Disposal Authority Pursuant to H.B. 705 of the 63rd Legislature (1975); Teutsch, *Subsidence in the Houston-Galveston Region: A Comprehensive Analysis,* M.S. Thesis, Rice University, 1977.

See also our opinion in *Coastal Industrial Water Authority v. York,* 532 S.W.2d 949 (Tex. 1976), wherein we note that land near the San Jacinto Monument "has subsided some nine feet in the past seventy years. . . ."

**7.** Chap. 284, 64th Legislature, Reg.Sess., effective April 23, 1975. See *Beckendorff v. Harris-Galveston Coastal Subsidence District,* 558 S.W.2d 75 (Tex.Civ.App.1977, writ ref'd n. r. e.), a case which upheld the constitutionality of the Act.

**8.** Id., Sec. 1a; Secs. 19–24; and Secs. 28–30.

ing up his well. The trial court found that the railroad's well was not a reasonable use of its property, and that plaintiff *and his land* had sustained damage in the sum of $206.00. Nevertheless, the trial court granted judgment for the railroad. The Court of Civil Appeals reversed and rendered judgment in favor of East. It followed what has since become known as the "reasonable use" or "American rule" as set forth in *Bassett v. Salisbury Mfg. Co.*, 43 N.H. 569, 82 Am.Dec. 179 (1862), which held that the right of a landowner to draw underground water from his land was not absolute, but limited to the amount necessary for the reasonable use of his land, and that the rights of adjoining landowners are correlative and limited to reasonable use. The court also noted the contrary English doctrine laid down in *Acton v. Blundell*, 12 M. & W. 324, 152 E.R. 1223 (Ex. 1843), that, "if a man digs a well on his own field and thereby drains his neighbor's, he may do so unless he does it maliciously." The court said that "to apply that rule under the facts shown here would shock our sense of justice."

### Adoption of the Common Law Rule of Absolute Ownership

Thus, on the appeal of the *East* case to this Court, the conflicting aspects of the "reasonable use" rule and the common law rule, later referred to as the "English rule" or "absolute ownership rule," were clearly presented. This Court discussed both rules and made a deliberate choice of the common law rule as announced in *Acton v. Blundell, supra*, reciting that it had been followed since 1843 in the courts of England "and probably by all the courts of last resort in this country before which the [subject] has come, except the Supreme Court of New Hampshire." *Houston & T. C. Ry. Co. v. East*, 98 Tex. 146, 81 S.W. 279, 280

(1904). In reversing the Court of Civil Appeals and rejecting the "reasonable use" rule, this Court adopted the absolute ownership doctrine of underground percolating waters. It cited approvingly the language of the Supreme Court of Ohio in *Frazier v. Brown*, 12 Ohio St. 294 (1861): "In the absence of express contract and a positive authorized legislation, as between proprietors of adjoining land, the law recognizes no correlative rights in respect to underground water percolating, oozing, or filtrating through the earth; and this mainly from considerations of public policy . . . ."[9]

In holding that the owner may withdraw water from beneath his land without liability for lowering the water table and thus damaging his neighbor's well and land, the Court mentioned only waste and malice as possible limitations to the rule. Absent these, the Court clearly embraced the doctrine stated in *Acton v. Blundell, supra*, that this type of damage "falls within the description *damnum absque injuria*, which cannot become the ground of action." This legal maxim denotes a loss without injury in the legal sense, that is, without the invasion of a legal right or the violation of a legal duty. *Langbrook Properties, Ltd. v. Surrey County Council*, 3 ALL E.R. 1424 (Ch.1969). In *Langbrook*, which was an action for subsidence caused by withdrawal of ground water, the court held that the law of negligence and nuisance did not apply under the English rule because pumping of the water was lawful and there was no duty to protect against the injury. We have been cited no case from a jurisdiction which adheres to the English rule in which actions in tort for subsidence have been recognized.

The English rule of so-called "absolute ownership" was applied by this Court in *Texas Co. v. Burkett*, 117 Tex. 16, 296 S.W. 273 (1927), which held that a landowner has

---

9. The public policy considerations were said to be (1) "because the existence, origin, movement and course of such waters, . . . are so secret, occult and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would, therefore, be practically impossi-

ble"; and (2) "because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage and agriculture, mining, . . ." etc. 81 S.W. 279 at p. 281. For criticisms of the reasons for the rule see note 17, infra.

the absolute right to sell percolating ground water for industrial purposes off the land. At a time when the trend in other jurisdictions was away from the English rule and toward the "reasonable use" rule, the English rule was reaffirmed by this Court in *City of Corpus Christi v. City of Pleasanton*, 154 Tex. 289, 276 S.W.2d 798 (1955). The Court said:

> "With both rules before it, this Court in 1904, adopted, unequivocally, the 'English' or 'Common Law' rule. *Houston & T. C. R. Co. v. East*, 98 Tex. 146, 81 S.W. 279, 280, 66 L.R.A. 738, 107 Am.St.Rep. 620. The opinion in the case shows quite clearly that the court weighed the merits of the two rules—'The practical reasons upon which the courts base their conclusions [applying the "English" rule] fully meet the more theoretical view of the New Hampshire Court [applying the "American" rule] and satisfy us of the necessity of the doctrine'—and, whether wisely or unwisely, made a deliberate choice. . . .
>
> ". . .
>
> "Having adopted the 'English' rule it may be assumed that the Court adopted it with only such limitations as existed in the common law. What were these limitations? About the only limitations applied by those jurisdictions retaining the 'English' rule are that the owner may not maliciously take water for the sole purpose of injuring his neighbor, 55 A.L.R. 1395–1398; 67 C.J., sec. 257, p. 840; or wantonly and willfully waste it. 56 Am. Jur., sec. 119, p. 602; *Stillwater Water Co. v. Farmer*, 89 Minn. 58, 93 N.W. 907, 60 L.R.A. 875. . . ." [10]

For similar recognition that percolating ground waters belong to the landowner and may be produced by him at his will, absent waste or malice, see *Pecos County Water Control & Imp. Dist. No. 1 v. Williams*, 271 S.W.2d 503 (Tex.Civ.App.1954, writ ref'd n. r. e.), which was pending in this Court simultaneously with the *Corpus Christi* case, *supra; City of Altus v. Carr*, 255 F.Supp. 828 (W.D.Tex.1966), aff'd mem. *Carr v. City of Altus*, 385 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966); and *U. S. v. Shurbet*, 347 F.2d 103 (5th Cir. 1965). See also *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935 (1935), one of the basic cases recognizing private ownership of oil and gas in place, which cites *East* as the earliest case establishing the "law of capture" in Texas. Other writers have traced both the Texas ownership and capture theories to the English rule relating to underground percolating waters, and it is interesting to note in this connection that the courts did not attempt to afford protection against the rule of capture of oil and gas until the Legislature enacted policy guidelines for the prevention of waste and protection of correlative rights.[11] By the same token, it has been suggested that regulation of ground water production is primarily a legislative, not a judicial problem.[12]

As heretofore mentioned in 1975 the Legislature undertook to retard further subsidence in Harris and Galveston Counties by creating a subsidence district with power to prevent future well spacing and excessive pumping of the nature alleged to have occurred in this case. Previously, in 1949 the Legislature provided for the creation of districts for the purpose of "conservation, preservation, protection, recharging, and prevention of waste of underground water . . . ."[13] In 1973, the Legislature added to such purposes the authority "to con-

---

10. In *Bradford Corp. v. Pickles*, 1 Ch. 145 (1895), aff'd H. L. [1895–99] ALL E.R. 984, and subsequent English cases, doubt was cast as to whether malicious injury was a limitation on the English rule. No doubt on this limitation has been expressed by this Court. We reaffirm the limitation in this opinion.

11. Kellam, *A Century of Correlative Rights*, 12 Baylor L.Rev. 1 (1960); Hardwicke, *The Rule of Capture and Its Implication As Applied to Oil and Gas*, 13 Tex.L.Rev. 391, 408–410 (1935).

12. Greenhill and Gee, *Ownership of Ground Water in Texas; The East Case Reconsidered*, 33 Tex.L.Rev. 620, 622, 629 (1955).

13. Ch. 306, Acts 51st Leg.1949, p. 559, codified as Ch. 52 of Vernon's Texas Water Code.

trol subsidence caused by withdrawal of water . . . ."[14]

It is of some importance to note that in the laws authorizing these regulatory Underground Water Districts and the Harris-Galveston Coastal Subsidence District, the Legislature specifically confirmed private ownership of underground water. It provided: "The ownership and rights of the owner of land and his lessees and assigns in underground water are hereby recognized, and nothing in this Act shall be construed as depriving or divesting the owner or his lessees and assigns of the ownership or rights . . . .," subject only to the regulatory rules to be promulgated by the districts. See Vernon's Tex.Water Code Ann. § 52.002 and Sec. 29, Ch. 284, Acts 64 Leg. 1975.

*Subsidence Cases Under the Common Law Rule*

Although the *East, Corpus Christi,* and *Williams* cases involved damages to wells and lands of the plaintiffs because the water tables beneath their lands were lowered by ground water withdrawals of the defendants, none of these nor any other Texas case has dealt specifically with land subsidence resulting from such pumping of underground waters. In other jurisdictions adhering to the English ground water rule, liability for neighboring land subsidence has been denied. *Langbrook Properties, Ltd. v. Surrey County Council,* [1969] 3 ALL E.R. 1424 (Ch. 1969); *New York Continental Jewell Filtration Co. v. Jones,* 37 App.D.C. 511 (D.C. Cir. 1911); *English v. Metropolitan Water Board,* 1 K.B. 588 (1907); *Elster v. City of Springfield,* 30 N.E. 274 (Ohio 1892); *Popplewell v. Hodgkinson,* [1861–73] ALL E.R. 996 (Ex. 1869). See also *Finley v. Teeter Stone, Inc.,* 251 M.D. 428, 248 A.2d 106 (1968), in which the same holding was made in a jurisdiction which follows the reasonable use rule.

On the basis of the earlier decisions cited above, the Restatement of Torts § 818 (1939), adopted the following rule:

"§ 818. WITHDRAWING SUBTERRANEAN WATER.

To the extent that a person is not liable for withdrawing subterranean waters from the land of another, he is not liable for a subsidence of the other's land which is caused by the withdrawal."

The foregoing statement in § 818 fairly represents the law on the subject as pronounced in common law jurisdictions. In 1840, Texas adopted the common law of England, with exceptions not relevant here. Our present Article 1, Texas Revised Civil Statutes, reads:

"The common law of England, so far as it is not inconsistent with the Constitution and laws of this State, shall together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature."

We have found nothing in our Constitution, laws, or decisions inconsistent with the common law rule. On the contrary, our decisions in *East, City of Pleasanton,* and *Williams,* denying liability for damages to neighboring property because of lowering the water tables beneath neighboring lands, are consistent with the rule as stated above. It has been suggested, but not by respondents, that another rule applicable to destruction of subjacent land support caused by withdrawal of minerals should be applied in this case. We disagree, because the common law has recognized a clear distinction between subsidence caused by withdrawal of water and that caused by withdrawal of minerals, especially when solid minerals were involved. Restatement of Torts § 820 (1939), relating to withdrawal of subjacent support, reflects this distinction by a specific exception of water withdrawals referred to in § 818, *supra,* as follows:

"§ 820. WITHDRAWING NATURALLY NECESSARY SUBJACENT SUPPORT.

(1) Except as stated in § 818, a person who withdraws the naturally necessary subjacent support of land in another's

14. Ch. 598, Acts 63rd Leg.1973, p. 1641, codified in Sec. 52.021 of the Texas Water Code.

possession or the support which has been substituted for the naturally necessary support is liable for a subsidence of such land of the other as was naturally dependent upon the support withdrawn, in the absence of a superseding cause or other reason for relieving him."

Although a tentative revision of § 818 was adopted by the American Law Institute in 1969, which would completely reverse this rule, it is important to our decision in this case that the Restatement of Torts rule as quoted above was in effect, without any tentative change, from 1939 to 1969.[15] The defendants began drilling and production from their wells in 1964 and the majority of their wells were completed by 1969.

The facts and legal issues in *Langbrook, supra,* were most similar to those in the instant case. In *Langbrook,* the plaintiffs alleged nuisance and negligence in an action for damages to their property due to subsidence alleged to have been caused by defendants in the manner by which they withdrew underground water from their own nearby property. The only question before the court was whether plaintiffs' suit, cast in nuisance and negligence, stated a cause of action. The court, after an exhaustive review of the English cases, held that the law of nuisance and negligence was not applicable in the case by reason of the acts complained of because there was no duty to take care against the resulting damage and no unlawful act of interference with lawful rights of the plaintiffs. The court said:

"The authorities cited on behalf of the defendants in my judgment establish that a man may abstract the water under his land which percolates in undefined channels to whatever extent he pleases, notwithstanding that this may result in the abstraction of water percolating under the land of his neighbour and, thereby, cause him injury. In such circumstances the principle of *sic utere tuo ut alienum non laedas* [use your property so as not to injure the property of another] does not operate and the damage is *damnum sine injuria* [damages suffered without the invasion of a legal right or the violation of a legal duty].

"Is there then any room for the law of nuisance or negligence to operate? In my judgment there is not . . . if there were, it seems to me highly probable that the courts would already have said so, and yet I have not been referred to any case in which that was done." [1969] 3 ALL E.R. Rep. at 1439–40.

The above holding is in accord with Texas rules of tort law that (1) in order to create liability for the maintenance of a nuisance, the act complained of must in some way constitute an unlawful invasion of the right of another, *Gotcher v. City of Farmersville,* 137 Tex. 12, 151 S.W.2d 565 (1941); and (2) for redress in negligence actions there must be a violation of a legal right and the breach of a legal duty, *State v. Brewer,* 141 Tex. 1, 169 S.W.2d 468 (1943).

### Stare Decisis

We agree that some aspects of the English or common law rule as to underground waters are harsh and outmoded, and the rule has been severely criticized since its

---

15. The tentative change of § 818 from non-liability to strict liability, with the addition of other substances, reads as follows:

"§ 818. WITHDRAWING SUBTERRANEAN SUBSTANCES.

One who is privileged to withdraw subterranean water, oil, minerals or other substances from under the land of another is not for that reason privileged to cause a subsidence of the other's land by such withdrawal."

The proceedings of the American Law Institute reflect that this change was proposed by the Reporter, Dean Prosser, in what he termed "a rather bob-tailed session," with the explanation that instead of fixing liability, this revision of § 818 would simply "knock out the absolute privilege to withdraw water without liability for the consequences." 1969 Proceedings of the American Law Institute 268, 273. The Reporter's *Note to Institute* appended to the tentative draft states that "[t]he Advisors and the Council, meeting the problem for the first time, are in some doubt, but express themselves as willing to follow the majority of the cases." [Most of which related to substances other than water.] See tentative draft proposal # 15, Restatement (Second) of Torts § 818, Ch. 39.

reaffirmation by this Court in 1955.[16] Most of the critics, however, recognize that it has become an established rule of property law in this State, under which many citizens own land and water rights. The rule has been relied upon by thousands of farmers, industries, and municipalities in purchasing and developing vast tracts of land overlying aquifers of underground water. Approximately 50,000 wells are used to irrigate 2,800,000 acres in the thirteen county High Plains area of West Texas.[17] As shown in the official reports cited earlier in this opinion, over 2,600 water wells have been drilled in Harris County alone while this rule of immunity from liability was in effect. The very wells which brought about this action were drilled after the English rule had been reaffirmed by this Court in 1955.

█ On this subject, we are not writing on a clean slate. Even though good reasons may exist for lifting the immunity from tort actions in cases of this nature, it would be unjust to do so retroactively. The doctrine of *stare decisis* has been and should be strictly followed by this Court in cases involving established rules of property rights. *Southland Royalty Co. v. Humble Oil and Refining Co.*, 151 Tex. 324, 249 S.W.2d 914 (1952); *Tanton v. State National Bank of El Paso*, 125 Tex. 16, 79 S.W.2d 833 (1935). It is for this reason that, as to past actions complained of in this case, we follow the English rule and Restatement of Torts § 818 (1939) in holding that defendants are not liable on plaintiff's allegations of nuisance and negligence. The same reasoning applies to plaintiffs' other allegations in tort (wrongful diversion of surface waters onto and across plaintiffs' lands and wrongful taking and conversion of plaintiffs' property), which the Court of Civil Appeals did not reach. We have considered all of plaintiffs' points of error in the Court of Civil Appeals complaining of the trial court's judgment and find them to be without merit.

### As To Future Wells and Subsidence

As heretofore mentioned, the Legislature has entered the field of regulation of ground water withdrawals and subsidence. This occurred after geologists, hydrologists, and engineers had developed more accurate knowledge concerning the location, source, and measurement of percolating underground waters, and after legislators became aware of the potential conflicts inherent in the unregulated use of ground water under the English rule of ownership. With a rule that recognizes ownership of underground water by each individual under his own land, but with no limitation on the manner and amount which another individual landowner might produce (absent willful waste and malicious malice), legislative action was essential in order to provide for conservation and protection of public interests.

The legislative policy contained in Chapter 52 of the Texas Water Code is designed to limit the exercise of that portion of the English rule which has been interpreted as giving each landowner the right to take all the water he pleases without regard to the effect on other lands in the same area. For instance, § 52.117 of the Water Code, appli-

16. See dissenting opinion of two justices in *City of Corpus Christi v. City of Pleasanton*, 154 Tex. 289, 276 S.W.2d 798 (1955); Castleberry, *A Proposal for Adoption of a Legal Doctrine of Ground-Stream Water Interrelationship in Texas*, 7 St. Mary's L.J. 503 (1975); Steelhammer and Garland, *Subsidence Resulting From the Removal of Ground Water*, 12 South Texas L.J. 201 (1970); Roger Tyler, *Underground Water Regulation in Texas*, Texas B.J., June 1976, 532; Snyder, *Ground Water Management: A Proposal for Texas*, 51 Tex.L.Rev. 289 (1973); Comment: *Subsidence*, 9 Texas Tech L.Rev. 392 (1977–78); Garland F. Smith, *The Valley Water Suit and Its Impact On Texas Water Policy*, 8 Texas Tech L.Rev. 577 (1977);

A. W. Walker, Jr., "Theories of Ownership and Control of Oil and Gas Compared With Those of Ground Water," Water Law Conference Proceedings, Univ. of Texas, p. 121 (1956); Teutsch, *Subsidence in the Houston-Galveston Region*, M.S. Thesis, Rice Univ. (1977). For objective discussions of the rule see Hutchins, *The Texas Law of Water Rights*, 565–585 (1961), and Greenhill and Gee, *Ownership of Ground Water in Texas; The East Case Reconsidered*, 33 Tex.L.Rev. 620 (1955).

17. Amicus Curiae Brief of the High Plains Underground Water Conservation Dist. No. 1, p. 6, filed in this case (1977).

cable to Underground Water Conservation Districts, provides:

> "§ 52.117. REGULATION OF SPACING AND PRODUCTION.
>
> "In order to minimize as far as practicable the drawdown of the water table or the reduction of artesian pressure, to control subsidence, or to prevent waste, the district may provide for the spacing of water wells and may regulate the production of wells." [18]

Ten of these Underground Water Conservation Districts are active in an area embracing much of West Texas. 33rd Report, Texas Water Rights Commission for Fiscal Year 1977. The need for additional legislation for creation of districts to cover unregulated ground water reservoirs and to solve other conflicts which may arise in this area of water law and subsidence seems to be inevitable. Providing policy and regulatory procedures in this field is a legislative function. It is well that the Legislature has assumed its proper role, because our courts are not equipped to regulate ground water uses and subsidence on a suit-by-suit basis.

This case, however, gives the Court its first opportunity to recognize, and to encourage compliance with, the policy set forth by the Legislature and its regulatory agencies in an effort to curb excessive underground water withdrawals and resulting land subsidence. It also affords us the opportunity to discard an objectionable aspect of the court-made English rule as it relates to subsidence by stating a rule for the future which is more in harmony with expressed legislative policy. We refer to the past immunity from negligence which heretofore has been afforded ground water producers solely because of their "absolute" ownership of the water.

As far as we can determine, there is no other use of private real property which enjoys such an immunity from liability under the law of negligence. This ownership of underground water comes with ownership of the surface; it is part of the soil.

Yet, the use of one's ground-level surface and other elements of the soil is without such insulation from tort liability. Our consideration of this case convinces us that there is no valid reason to continue this special immunity insofar as it relates to future subsidence proximately caused by negligence in the manner which wells are drilled or produced in the future. It appears that the ownership and rights of all landowners will be better protected against subsidence if each has the duty to produce water from his land in a manner that will not negligently damage or destroy the lands of others.

Therefore, if the landowner's manner of withdrawing ground water from his land is negligent, willfully wasteful, or for the purpose of malicious injury, and such conduct is a proximate cause of the subsidence of the land of others, he will be liable for the consequences of his conduct. The addition of negligence as a ground of recovery shall apply only to future subsidence proximately caused by future withdrawals of ground water from wells which are either produced or drilled in a negligent manner after the date this opinion becomes final.

While this addition of negligence as a ground of recovery in subsidence cases applies to future negligence in producing water from existing wells and those drilled or produced in a negligent manner in the future, it has been suggested that this new ground of recovery should be applied in the present cause of action. This is often done when a court writes or adds a new rule applicable to personal injury cases, but seldom when rules of property law are involved. *Klocke v. Klocke*, 276 Mo. 572, 208 S.W. 825 (1919); 10 A.L.R.3d 1371, 1388; Currier, *Time and Change in Judge-Made Law: Prospective Overruling*, 51 Va.L.Rev. 201, 242–43 (1965). This is because precedent is necessarily a highly important factor when problems regarding land or contracts are concerned. In deeds, property

---

18. Sec. 29 of the Harris-Galveston Coastal Subsidence District Act, Ch. 284, Acts 64th Leg. 1975, contains a similar provision.

transactions, and land developments, the parties should be able to rely on the law which existed at the time of their actions. For the power of the courts in this regard, see *Great Northern Ry. Co. v. Sunburst Oil and Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

### Judgment

Accordingly, the judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Dissenting Opinion by POPE, J., in which SAM D. JOHNSON, J., joins.

CHADICK, J., not sitting.

POPE, Justice, dissenting.

I respectfully dissent. The court has decided this cause upon the mistaken belief that the case is governed by the ownership of ground water. Plaintiffs assert no ownerships to the percolating waters pumped and extracted from the ground by defendants. They make no complaint that their own wells have been or will be pumped dry. They seek no damages for the defendants' sale of the water. Plaintiffs' action calls for no change in nor even a review of the English rule of "absolute ownership" of ground water, the American rule of "reasonable use" of ground water, nor the Texas rule of "nonwasteful" use of ground water. They claim no correlative rights in the water. The Texas law of percolating waters is not put in issue by this suit, and there is no occasion to overrule that law either now or prospectively. There is a question whether this court can or ought to do so after the Texas legislature has so often and so recently stated its intent that the law of ground waters should be respected. Tex.Water Code Ann. §§ 21.004,[1] 52.-002;[2] 1975 Tex.Gen.Laws, ch. 284, § 40, at 682 (creating Harris-Galveston Coastal Subsidence District).

Plaintiffs' complaint is that defendants are causing subsidence of their land. They assert an absolute right to keep the surface of their land at its natural horizon. The landowners' right to the subjacent support for their land is the only right in suit, and this is a case of original impression. Other areas of the law should not be disturbed, but the majority opinion needlessly does so. It is no more logical to say that this is a case concerning the right to ground water than it would be correct in a case in which an adjoining landowner removed lateral support by a caterpillar to say that the case would be governed by the law of caterpillars. In making this decision about one's right to subjacent support, I would use as analogies other kinds of cases concerning support, such as the right to lateral support.

A landowner's right to lateral support for his land is an absolute right. The instrument employed in causing land to slough off, cave in or wash away is not the real subject of inquiry. The inquiry is whether the adjoining owner actually causes the loss of support. Whether the support is destroyed by excavation, ditching, the flowing of water, the pumping of water, unnatural pressure, unnatural suction, or explosives, the right to support is the same, and it is an absolute right. *Nichols v. Woodward Iron Company*, 267 Ala. 401, 103 So.2d 319 (1958); *Williams v. Thompson*, 152 Tex. 270, 256 S.W.2d 399 (1953); *Whitehead v. Zeiller*, 265 S.W.2d 689 (Tex.Civ.App.—Fort Worth 1954, no writ); *Simon v. Nance*, 100 S.W. 1038 (Tex.Civ.App. 1907, no writ); 2 C.J.S. *Adjoining Landowners* § 38 (1972). It was said in *San Jacinto Sand Co. v. Southwestern Bell Tel. Co.*, 426 S.W.2d 338, 345 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n. r. e.), in a case that concerned both the lateral and subjacent right to support for a utility easement: "[T]he existence of the right to lateral support is an absolute right and is not subordi-

---

1. Nothing in this chapter affects ownership rights in underground water.

2. The ownership and rights of the owner of the land and his lessees and assigns in underground water are hereby recognized, and noth-

ing in this code shall be construed as depriving or divesting the owner or his lessees and assigns of the ownership or rights, subject to the rules promulgated by a district under this chapter.

nate to any right of the *adjoining* proprietor." *Nichols v. Woodward Iron Company, supra.* And again, the opinion stated, "Whether we say that necessary lateral and subjacent support of the easement here involved is an incident of appellee's right to the complete enjoyment of the easements, or whether lateral and subjacent support is a separate right of property makes little practical difference."

Respectable American authority supports the rule that a landowner has the right to the support afforded by subterranean waters. *New York Central R. Co. v. Marinucci Bros. & Co.,* 337 Mass. 469, 149 N.E.2d 680 (1958); *Gamer v. Milton,* 346 Mass. 617, 195 N.E.2d 65 (1963), [rejecting the decision in *Popplewell v. Hodkinson,* L.R. 4 Ex. 248 (1869)]; *Cabot v. Kingman,* 166 Mass. 403, 44 N.E. 344 (1896); *Bjorvatn v. Pacific Mechanical Construction, Inc.,* 77 Wash.2d 563, 464 P.2d 432 (1970); *Muskatell v. City of Seattle,* 10 Wash.2d 221, 116 P.2d 363 (1941); *Farnandis v. Great Northern Ry. Co.,* 41 Wash. 486, 84 P. 18 (1906); 1 Am. Jur.2d *Adjoining Landowners* § 80 (1962); 2 C.J.S. *Adjoining Landowners* § 38 (1972); Annot., 4 A.L.R. 1104.

A second analogous rule which protects one's subsurface from damage by an operator on other lands is found in *Gregg v. Delhi-Taylor Oil Corp.,* 162 Tex. 26, 33, 344 S.W.2d 411, 416 (1961). Mr. Gregg, in the development of his mineral lease, was preparing to use a sand fracturing technique to open cracks and veins extending some distance from his lease and to alter the substructure of neighboring land. By use of hydraulic pressure the ruptures of the subsurface formations would free greater quantities of gas. The rupture beneath the Delhi-Taylor's lands would create only small veins about one-tenth of an inch in diameter. This court regarded the creation of fissures on another's land as an invasion of property rights. "The invasion alleged is direct and the action taken is intentional. . . . While the drilling bit of Gregg's well is not alleged to have extended into Delhi-Taylor's land, the same result is reached if in fact the cracks or veins extend into its land and gas is produced therefrom

by Gregg." This court denied one landowner the right to interfere with the subsurface of lands beyond his own lease boundaries. The same principle was applied in *Gregg v. Delhi-Taylor Oil Corp.,* 162 Tex. 38, 344 S.W.2d 419 (1961), and in *Delhi-Taylor Oil Corp. v. Holmes,* 162 Tex. 39, 344 S.W.2d 420 (1961).

In my judgment, the examples are indistinguishable from the present case. The geologic changes that the defendants are creating beneath the surface of the plaintiffs' land in the instant case are more severe than in the *Gregg* and *Holmes* cases. The plaintiffs made summary judgment showing that the defendants squeeze the water from the clay beneath plaintiffs' lands, and the clay is then compressed and compacted so that the layers become thinner. The subterranean strata beneath plaintiffs' land is wholly altered by the process. The process is permanent and irreversible. If one may not use pressure that alters the geologic status of one's subsurface estate, how can we approve a process which reduces the pressure and which more grievously alters the subsurface estate? With respect I suggest, had we used the same argument in the *Gregg* and *Holmes* cases that is today employed, we would have approached the problem by looking at *Gregg's* and *Holmes's* right to capture the oil through its wellbore on its own lease. Once we determine that they had the right to capture and own the oil, we would have ruled that the case was solved. In *Gregg* and *Holmes,* we correctly looked at the damage to the neighbors' subsurface estate that was threatened by one who had a complete legal right to capture from a wellbore on his own land the oil from beneath another's land. The right of capture did not carry with it the right to destroy or interfere with the geology beneath another's land.

*Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 4 A.L.R.2d 191 (1948), was another example in which this court looked at the damage done a neighbor's subsurface estate by an oil driller who had the right to capture oil through the wellbore on his own

lease. This court expressly rejected holdings by the Louisiana Supreme Court which held that an adjoining owner has no action against one who negligently destroys a reservoir. This court also rejected the defense that one's right to capture the oil rendered him immune from damages for his negligence in wasting it.

We thus reach the end result. Under our prior holdings compared with today's, one who mines for oil may not destroy his neighbor's subjacent geology; but the right to pump water, we inconsistently say, is the right to destroy the subsurface geology, the subjacent support and even the surface of the land. Defendants may pump the plaintiffs' land to the bottom of Galveston Bay.

There is a third analogous area which has rejected the approach and result of today's decision. This area of the law is one in which one party actually contracts with another that the latter may remove the minerals beneath his surface estate. This area of the law presents the contest between the rights of the servient surface estate and the dominant mineral estate. This court has already held that the owner of the dominant estate may not exercise his rights to the point of destruction. In *Acker v. Guinn,* 464 S.W.2d 348, 352 (Tex.1971), we wrote that the grant of a right to mine for substances does not contemplate "that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired." Even when the right to mine had been granted by contract, we rejected a practice that would consume or destroy the surface estate. Consistent with that trend to avoid the destruction of the surface estate, we also made our decision in *Getty Oil Co. v. Jones,* 470 S.W.2d 618 (Tex. 1971). In *Getty Oil,* we protected the servient surface estate from the dominant mineral estate which did no more than interfere with an automatic irrigation system. If, therefore, this court will protect a servient estate in its operation of a watering system, surely we will protect an owner of an absolute property right to subjacent support from a neighbor whose practice is thrusting his land beneath the sea. *See also, Humble Oil & Refining Company v.*

*West,* 508 S.W.2d 812 (Tex.1974); *Winslow v. Duval County Ranch Company,* 519 S.W.2d 217 (Tex.Civ.App.—Beaumont 1975, writ ref'd n. r. e.); Hanen, *The Surface Mineral Producer v. The Oil and Gas Producer; A Need For Peaceful Coexistence,* 29 Baylor L.Rev. 907 (1977).

The error of the majority is its narrow focus upon the right of the defendants to pump ground water. We should enlarge our vision so we can see what this lawsuit is about. I do not believe it is sound law that the right to pump water is the power to destroy the surface of surrounding landowners. If defendants argue that they have an absolute right to pump groundwater, plaintiffs reply that they too have an absolute right to the support of their natural surface. According to some of the summary judgment proofs, the defendants with knowledge have destroyed and are destroying the natural surface estate of the plaintiffs. The summary judgment proofs include showings that the plaintiffs own lands that were originally seven feet above sea level; today their land is flooded or subject to periodic flooding and the situation is getting worse. The natural shoreline banks which once protected lands from Galveston Bay and Clear Lake have now fallen below sea level. Lands are innundated. More lands will be innundated in the future. Lands that were once above sea level are now under salt water.

There is yet another legal principle that we should observe. Many things, though lawful, when done to excess, become remediable. Church bells may toll the knell of parting day or announce the time for solemn services, but when bells continuously clang without interruption for many days, the rights of others spring into being. What we do cannot be understood except in relation to those we touch. We have in this case the pleadings and showing that the defendants have abused their right to pump water to the point that property and the rights of others are ignored and destroyed.

Plaintiffs asserted their action upon theories of negligence, intentional tort, nui-

sance, and a taking of their property. In my opinion, subject to proof, they have an action on the first three theories.

I therefore dissent from this court's treatment of this case as one which concerns ownership of ground water. I dissent from this court's endorsement of English water cases that have been rejected in this country. I dissent from this court's adherence to the Restatement of Torts § 818. As discussed above, Texas has its own developed and developing law in this area of the law that is fair and equitable. The members of the Restatement Committee are neither legislators nor members of the Congress, and we do not need their help in this instance.

I dissent from the court's holding that this case is governed by the stare decisis of ground water cases. There has not previously been a case like this in Texas and there is no stare decisis applicable. Damages for subsidence was not the issue when courts were writing *City of Corpus Christi v. City of Pleasanton,* 154 Tex. 289, 276 S.W.2d 798 (1955), and *Texas Co. v. Burkett,* 117 Tex. 16, 296 S.W. 273 (1927), and *Houston & T. C. Ry. Co. v. East,* 98 Tex. 146, 81 S.W. 279 (1904). The parties in these cases were fighting over water rights. Nor was that the issue in *Acton v. Blundell,* 12 Meeson & Welsby 324, 152 Eng.Rep. 1223 (Ex.1843). The law stated by those cases need not and should not be disturbed by today's opinion. Because there is no stare decisis, I also dissent from the court's holding that plaintiffs can have no remedy except by a retroactive application of the law. The defendants, according to some of the summary judgment proofs, had knowledge from expert opinions that their course of action would cause subsidence. When the defendants, after warning, elect to take their risks in an area in which there are no precedents, I see no reason to apply our holding prospectively. No property law had attached in this instance. I dissent from the court's dicta that the legislature has in some fashion recognized or legislated about the defendants' immunity. Where is that legislation found?

Finally, and importantly, I dissent from the majority's holding that landowners in the future may prosecute a suit for damages for the destruction of their property if, and only if the action is one for negligence, wilful waste, or malicious injury. I rather assume that pumpers of ground water will carefully do so, will not waste their water, and will bear no ill will toward those whose property they are destroying. In fact, pumpers more probably, will feel benignly toward those who regrettably must suffer the loss of their lands under the law of *Friendswood Development Company v. Smith-Southwest Industries, Inc.*

I would hold that an owner of land may assert an action against one who destroys the lateral or subjacent support to his land in its natural state when: (1) he engages in conduct knowing that it will cause damages to another's land by loss or destruction of the subjacent support, *Paris Purity Coal Co. v. Pendergrass,* 193 Ark. 1031, 104 S.W.2d 455 (1937); or (2) the plaintiff proves negligence, or (3) the plaintiff proves a nuisance, and here a balancing will be a factor. Justice Williams, the author of *East* also wrote *Gulf, C. & S. F. Ry. Co. v. Oakes,* 94 Tex. 155, 58 S.W. 999 (1900), and accepted this reasonable solution to the resolution of the conflict between two property rights:

It is a general principle of the law that the owner of property may use it as he chooses in any lawful way; but another maxim, in general terms, requires him to so use it as not to injure another. . . . Since the owner may use his land as he chooses, if he does not violate any law, and is not to be substantially deprived of its use or of the ordinary pursuit of his own interests, but, at the same time, is required in its use to avoid injury to another, it at once follows that he may be required to forego a particular use when it is not essential to the substantial enjoyment of his property, and is fraught with unreasonable loss to his neighbor. On the other hand, the particular use may be so important to the owner, and the loss or inconvenience to his neighbor so slight compared to his, were he forbidden to so

employ his property, that it would be unreasonable and unjust to impose such a restriction. In such cases, it is evident that all of the circumstances of the situation must be taken into consideration. The importance of the use to the owner, as well as the extent of the damage to be inflicted upon his neighbor, and the rights of the parties, are to be adjusted in a practical way; the question being whether or not the proposed use is a reasonable one, under all the circumstances. . . As is said in some of the authorities, there must, in such inquiries where rights and interests seem to conflict, be a balancing of them. Id. at 1000–01.

The balancing of lawful but competing property rights has been the rule previously approved by our Texas courts. *Storey v. Central Hide & Rendering Co.,* 148 Tex. 509, 226 S.W.2d 615 (1950); *City of Texarkana v. Reagan,* 112 Tex. 317, 247 S.W. 816 (1923); *Crossman v. City of Galveston,* 112 Tex. 303, 247 S.W. 810 (1923); *Galveston, H. & S. A. Ry. Co. v. De Groff,* 102 Tex. 433, 118 S.W. 134 (1909); *Columbian Carbon Co. v. Tholen,* 199 S.W.2d 825 (Tex.Civ.App.— Galveston 1947, writ ref'd). We wrote in *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 584, 210 S.W.2d 558, 563 (1948), "In the conduct of one's business or in the use and exploitation of one's property, the law imposes upon all persons the duty to exercise ordinary care to avoid injury or damage to the property of others." That rule is fair. It has often been applied in Texas as appears from the citations above and there are many others. *Rogers v. Scaling,* 298 S.W.2d 877 (Tex.Civ.App.—Fort Worth 1957, writ ref'd n. r. e.); *Hoover v. Horton,* 209 S.W.2d 646 (Tex.Civ.App.—Amarillo 1948, no writ); *Brown v. Cooper,* 31 S.W. 316 (Tex.Civ.App. 1895, no writ). *See also,* Wright, *Establishing Liability For Damage Resulting From the Use of Underground Percolating Water: Smith-Southwest Industries v. Friendswood Development Company,* 15 Hous.L.Rev. 454 (1978).

I also dissent from the court's denial of rights to the plaintiffs, while acknowledging that future landowners may have an action at least in negligence. This court, in recent years, has recognized a number of new actions, and each time, the successful party was allowed the victory. Among the recent examples are *Whittlesey v. Miller,* 572 S.W.2d 665 (Tex.1978) [consortium]; *Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex.1978) [abolition of no-duty doctrine in premises cases]; *Bounds v. Caudle,* 560 S.W.2d 925 (Tex.1977) [interspousal tort immunity abolished in case of wilful and intentional torts]; *Farley v. M M Cattle Company,* 529 S.W.2d 751 (Tex.1975) [abolition of voluntary assumption of risk]; *Felsenthal v. McMillan,* 493 S.W.2d 729 (Tex.1973) [criminal conversation]; *Getty Oil Company v. Jones,* 470 S.W.2d 618 (Tex.1971) [dominant estate limited by rule of reasonable necessity]. In my opinion, it is basically unfair to treat the plaintiffs in this case unequally by recognizing that they possess an action, but by denying them the remedy.

I would affirm the judgment of the court of civil appeals.

SAM D. JOHNSON, J., joins in this dissent.